**In the United States District Court**
**Southern District of Ohio**
**Eastern Division**

Angel Miller
2011 Good Hope New Holland Rd.
New Holland, OH 43145

**Plaintiff**

**vs.**

Javitch Block LLC
1100 Superior Avenue, 19th Floor
Cleveland, OH 44114

**and**

UHG 1, LLC
One Maroon Circle
9781 S. Meridian Blvd., Suite 3
Englewood, CO 80112

**and**

Annemarie Carmen Wodzisz
c/o Javitch Block LLC
1100 Superior Avenue, 19th Floor
Cleveland, OH 44114

**and**

Craig Manseth
c/o UHG I LLC
6400 Sheridan Dr. Ste 138
Buffalo, NY 14221

**and**

Jacob Adomo
c/o UHG I LLC
6400 Sheridan Dr. Ste 138
Buffalo, NY 14221

**and**

Darren Turco
c/o UHG I LLC
6400 Sheridan Dr. Ste 138
Buffalo, NY 14221

**and**

UHG, LLC

**CASE NO**: 2:25-cv-793

**JUDGE:**

**CLASS ACTION COMPLAINT**

**Jury Demand Endorsed Hereon**

6400 Sheridan Drive, Suite 138
Buffalo, NY 14221

**and**

UHG II, LLC
6400 Sheridan Drive, Suite 138
Buffalo, NY 14221

**and**

John Does 1 to 3 (doing business as United Holding Group, United Holding Group, LLC, or United Holdings Group, LLC)
6400 Sheridan Drive, Suite 138
Buffalo, NY 14221

**Defendants**

## Preliminary Statement

Plaintiff in this Complaint seeks actual damages, statutory damages, punitive damages, treble damages, and attorney fees, as well as costs of this action for violations of the Fair Debt Collection Practices Act, 15 U.S.C. Sec. 1692 et seq. (FDCPA); violations of the Ohio Consumer Sales Practices Act, Ohio Rev. Code 1345.01 (CSPA); Commission of criminal acts, fraud, negligence and civil conspiracy. Ms. Miller seeks damages for herself and as representative of a class of similarly situated individuals. This case arises from defendants' attempts to collect a debt from Ms. Miller, including the filing of a debt Collection Complaint on September 19, 2024, which initiated a debt Collection Lawsuit in the Washington Court House Municipal Court in Fayette County, Ohio. The Collection Complaint was filed by defendants Javitch Block and Annemarie Carmen Wodzisz, naming UHG I, LLC as plaintiff. Angel Miller, Plaintiff in this case, makes the following pleading allegations based on information and belief.

## Jurisdiction and Venue

1. This Court has subject-matter jurisdiction over this action because it is brought under the federal law, specifically the Fair Debt Collection Practices Act, 15 U.S.C. Sec. 1692 et seq.
2. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S. Code Sec. 1367(a) as the state law claims are so related to the Fair Debt Collection Practices Act Claim that they form part of the same case or controversy under Article III of the United States Constitution.
3. A substantial part of the events that give rise to Ms. Miller's claims occurred in this Court's Judicial District. As such, venue is proper in this Court pursuant to 28 U.S.C § 1391(b)2).

## Parties

4. Angel Miller is a natural person residing at all times relevant to this case in New Holland, Ohio.
5. UHG, LLC is a Delaware Limited liability company with its principal place of business at 6400 Sheridan Drive, Suite 138, Williamsville, New York.
6. UHG 1, LLC (UHG 1) is a Delaware limited-liability company with its principal place of business as 6400 Sheridan Drive, Williamsville, New York, and does business under the assumed name "United Holding Group."
7. UHG II LLC ("UHG II") is a Delaware Limited-Liability company with its principal place of business at 6400 Sheridan Drive, Williamsville, New York.
8. At all times relevant, UHG 1, LLC, UHG II LLC have done business, and continue to do business, under names "United Holding Group," "United Holdings Group, LLC," and "United Holdings Group, LLC."
9. Craig Manseth resides in Parker, Colorado.
10. Manseth is a founder, Co-Chief Executive Officer, and Chief Financial officer of UHG.
11. Since 2017, Manseth has had managerial responsibility for UHG and has materially participated in its affairs.
12. Jacob Adomo resides in Pendleton, New York.
13. Adomos is a founder, Co-Chief Executive Officer, and Chief Operations Officer of UHG.
14. Since 2017, Adomo has had managerial responsibility for UHG and has materially participated in its affairs.
15. Darren Turco resides in Parker, Colorado.
16. Turco is a founder and Co-Chief Executive officer of UHG.
17. Since 2017, Turco has had managerial responsibility for UHG and has materially participated in its affairs.
18. Javitch Block, LLC, (hereafter "Javitch") is a law firm engaged in the collection of debts, including the debt alleged in the Collection Complaint.
19. Javitch is a debt collector.
20. Javitch's principal place of business is 1100 Superior Avenue, 19th Floor, Cleveland, Ohio 44114-2531.
21. Javitch's website states "Javitch Block LLC is a debt collector," and further identifies itself as "a law firm concentrating in the area of creditor representation. Our primary representation is in Collections and Insurance Subrogation. The Collections Practice includes recovery of all types of debts, including credit card, installment loans, taxes, student loans, rent, commercial accounts receivable, and purchased debt."
22. Annemarie Carmen Wodzisz ("Wodzisz") is an employee of Javitch and is the attorney who signed and filed the Collection Complaint.

## Facts

23. UHG 1, LLC (UHG 1) is a person who, for compensation or other valuable consideration, offers services to collect an alleged debt asserted to be owed to another person.

24. The principal purpose of UHG 1's business is the collection of debt.

25. On September 19, 2024, UHG 1 caused to be filed against Angel Miller a collection complaint in the Washington Court House Municipal Court. ("Collection Complaint" or "Collection Lawsuit").

26. Defendant UHG I had no legal right to the claims it made and continues to make in Collection Complaints that it causes to be filed; (the "Collection Complaints"), and it has made willful misrepresentations as to such right.

27. UHG I is a person who, for compensation or other valuable consideration, offers services to collect an alleged debt asserted to be owed to another person.

28. UHG I's assertion in the Collection Complaints that it has acquired right, title or interest in the alleged debt is false or misleading.

29. UHG I's assertion in the Collection Complaints that it is entitled to recover the amount allegedly owed by Angel Miller and other consumers is false or misleading.

30. UHG I is not the legal and equitable owner of the debt alleged in the Collection Complaints.

31. The debt alleged in the Collection Complaints is not an asset, as that term is used for financial and tax purposes, of UHG I on the date the Collection Complaints are filed.

32. UHG I does not accrue income and expenses, related to the debt alleged in the Collection Complaints, for financial and tax purposes.

33. UHG I makes assertions as to the rights it claimed to have acquired in the alleged debt, without adequate investigation as to the truth of that assertion.

34. On the date the Collection Lawsuit was filed against Angel Miller, UHG I had not taken an assignment of the debt alleged in the Collection Complaint, that satisfies all of the requirements set forth in Ohio Revised Code Section 1319.12.

35. UHG I was not the real party in interest in the Collection Lawsuit.

36. UHG I has concealed, or failed to disclose, the real party or parties in interest as to the debt alleged in the Collection Lawsuit.

37. UHG I is not entitled to retain, other than a fee for its collection services, the money that it seeks to collect in this case.

38. UHG I is a company that acts as a debt collector, as defined by § 1692a of the FDCPA, because it regularly uses, directly or indirectly, the mails and/or the telephone, and/or other instrumentalities in interstate commerce in its business, the principal purpose of which is the collection of debts.

39. UHG 1 is a debt collector because it collects, or attempts to collect, directly or indirectly, delinquent consumer debts owed or due to another person or asserted to be owed or due to another entity.
40. UHG I is part of a nationwide delinquent debt collection business.
41. UHG I attempts to collect debts from consumers in the State of Ohio via collection letters, phone calls, credit reports, electronic communications and lawsuits.
42. UHG I was acting as a debt collector, as that term is defined in the FDCPA, as to the delinquent consumer debt it attempted to collect from Plaintiff.
43. UHG I does business as United Holding Group.
44. UHG I, along with UHG, LLC, UHG II, LLC, and John Does 1 to 3, collectively hold themselves out as United Holding Group, United Holding Group, LLC, and United Holdings Group, LLC, and will be referred to in this pleading collectively as "UHG"
45. UHG is a debt collector whose principal purpose is consumer debt collection, and it regularly collects, or attempts to collect, debts owed or due to another entity.
46. UHG has claimed to purchase defaulted consumer debt worth tens of millions of dollars. It places the debt portfolios it claims to have purchased with other debt collection companies, and they also engage in direct collection activity with consumers.
47. UHG has knowingly or recklessly placed debts to debt collection agencies that used threats and misrepresentations to coerce payments from consumers, including Angel Miller, Plaintiff herein.
48. UHG also directly interacts with consumers in furtherance of and in support of such debt collection activity, including collection on fraudulently acquired judgments through payment plans, filing of judicial liens, bank attachments and wage garnishments.
49. Craig Manseth, Darren Turco, and Jacob Adomo (collectively "UHG Operators") directed or controlled the unlawful conduct of UHG and also participated directly in the unlawful conduct of UHG.
50. Manseth is a founder, Co-Chief Executive Officer and Chief Financial Officer of UHG.
51. At all times relevant to this case, Manseth has had managerial responsibility for UHG, and has materially participated in its affairs.
52. Turco, along with Manseth and Adamo determine which debt portfolios UHG purchases.
53. Turco, along with Manseth and Adomo has developed UHG's business strategies and practices.
54. Turco, along with Manseth and Adomo oversees UHG's workforce.
55. Turco, along with Manseth and Adomo, determines which debt collectors collect on the debt for UHG and which debt collectors are terminated.
56. Adomo is a founder, Co-Chief Executive Officer and Chief Operations Officer of UHG.

57. At all times relevant to this case, Adomo has had managerial responsibility for UHG and has materially participated in its affairs, including the supervision of employees who have created false affidavits on behalf of the plaintiff.
58. Adomo, along with Turco, monitors debt collectors' activities and compliance, which includes handling escalated complaints, on behalf of UHG.
59. UHG holds itself out as "United Holding Group" which is the name that it uses on its letterhead for corporate and consumer correspondence, internal documents, forms, policies and procedures, documents it provides in support of its contracts with lenders and other debt collectors, and its public facing website (www.uhgllc.com), which bears the name and logo "United Holding Group" in large letters at the top and refers to the company as "United Holding Group" throughout.
60. UHG Operators, all previously owners and/or employees of three different debt collection companies, joined forces and they combined their three companies together under the name UHG, a debt buyer based in New York.
61. UHG, at the direction of the UHG Operators contracted with debt collectors to collect debt on behalf of UHG either directly or through another debt collector.
62. UHG provided debt collectors collecting on their behalf with consumers' contact information, personal identifying information, and account details related to the debt the consumers allegedly owed.
63. Between September 2017 and April of 2020 UHG sought to collect more than 6.5 million consumer debt accounts throughout the United States, many in Ohio; with an alleged face value of 58 billion dollars.
64. The debt collectors remit a percentage of the amount collected from each consumer to UHG pursuant to agreement.
65. At all times relevant to this case, UHG and the UHG Operators exercised control over the debt collectors collecting the debt placed by UHG.
66. UHG, as well as the UHG Operators, have the authority to instruct debt collectors about how to handle consumer complaints and whether to discipline collection employees and how to change collection behavior.
67. UHG and the UHG Operators have authority to remove accounts from debt collectors and refuse to send additional accounts to debt collectors.
68. UHG authorized the debt collectors to contact the consumers directly.
69. The debt collectors used information provided by UHG to collect directly from consumers.
70. In some instances, the debt collectors told consumers they were collecting on behalf of UHG.
71. In some instances, when UHG spoke directly with consumers, UHG directed consumers back to the debt collectors to work out the details of debt payment or to verify the debt.

72. UHG directly or through its debt collectors made numerous persistent aggressive and threatening telephone calls to Angel Miller, including threats of an imminent lawsuit, claiming this call was the final step before suit, and using loud, threatening, aggressive tones, all in an effort to obtain payments on and collect the debt claimed to be owed in this case.

73. The debt collector who threatened Ms. Miller was not authorized to file suit against Ms. Miller and was not lawfully able to do so.

74. None of the debt collectors referenced above were authorized to file suit and none were lawfully able to do so.

75. A threat of a lawsuit is material to a consumer's decision about when or if to pay a debt and such misstatement is likely to mislead a consumer acting reasonably under the circumstances.

76. The debt asserted in the Collection Lawsuit is time-barred.

77. The debt asserted in the Collection Lawsuit is unenforceable.

78. The facts that the Collection Lawsuit is time barred and that the debt is unenforceable is clear on the face of the documents filed with the Collection Complaint.

79. UHG and the UHG Operators have participated in, supported, or furthered the wrongful debt collection practices challenged in this Complaint.

80. Further facts as to the identity and debt collection practices of UHG and the UHG Operators are described in an Amended Complaint filed by the Consumer Financial Protection Bureau ("CFPB") against these Defendants in the United States District Court for the Western District of New York in Case 22-cv-00029-LIV. The CFPB Amended Complaint is attached hereto as Exhibit 2, and the factual allegations of the Amended Complaint are incorporated herein by this reference.

81. UHG Operators, and UHG knew or should have known their debt collector agents, with which they placed debt for collection were making false threats and false statements to consumers and courts. But despite that knowledge, they continued to place for collection, support, and further the debt collection activities of such debt collector agents, including through direct interaction with consumers.

82. Ms. Miller is an individual resident of Ohio and a "Consumer" as defined in the Ohio Consumer Sales Practice Act, R.C. § 1345.01(D), and in 15 U.S.C. 1692a (3).

83. At all times pertinent to this case, Ms. Miller resided at 2011 Good Hope New Holland Road, New Holland, Ohio 43145.

84. Javitch communicates to Ohio consumers that it acts, at times, solely as debt collector and not as attorney.

85. On September 19, 2024, Wodzisz and Javitch filed the Collection Lawsuit against Ms. Miller.

86. Wodzisz signed and caused to be filed the Collection Complaint.

87. Wodzisz's signature on the Collection Complaint constituted a certificate that she had read the Collection Complaint; and that to the best of her knowledge, information and belief there was good ground to support it.

88. Defendants knew at the time that they filed the Collection Complaint that many of the collection lawsuits they filed, including this one, were time-barred in Ohio.

89. Defendants knew at the time they filed the Collection Complaint that many of the collection lawsuits they filed sought enforcement of debts not legally enforceable.

90. Defendants knew at the time they filed the Collection Complaint that many of the collection lawsuits they filed, including this one, asserted claims that were either already pending in court or had already been adjudicated.

91. Defendants knew at the time that they filed the Collection Complaint that Defendants did not have good ground to support the Collection Complaint.

92. The filing of the Collection Complaint with the knowingly false certificate was a false statement in writing knowingly made of a material fact in an official proceeding designed to make use of the court to obtain a judgment by deception to mislead judges to deprive Ms. Miller and others of their property without their consent for the purpose of executing on that judgment to deprive Ms. Miller of her property through bank attachments and a judgment lien, and her income through wage garnishments.

93. The Collection Complaint against Ms. Miller was a claim of indebtedness filed with a court of record.

94. The benefits sought by the knowingly false Collection Complaints, in this and other cases, such as judgments and use of the courts and public officials to execute on those judgments were valuable benefits to defendants.

95. The Collection Complaint initiated an official proceeding in court.

96. In response to the Collection Complaint, Ms. Miller paid an attorney an initial amount of $500 in fees to defend against the lawsuit. She has expended time and money since to travel to the courthouse to obtain copies of court files and to file documents where necessary to meet deadlines in that remote location.

97. On July 18, 2024, Defendants sent a communication to Ms. Miller attempting to collect a debt that they knew was the subject of a pending court proceeding, that Ms. Miller had already disputed the debt, and that Ms. Miller was represented by counsel as to such claim.

98. In the July 18, 2024, communication, Defendants falsely alleged that Ms. Miller was required to again dispute the debt despite having previously done so.

99. In the July 18, 2024, communication, Defendants falsely alleged that if Ms. Miller did not again dispute the debt, the debt would be assumed to be correct.

100. The July 18, 2024 communication was a continuation of a pattern of harassment.

101. Defendants have communicated with other Ohio consumers attempting to collect debt that that they knew was the subject of a pending court proceeding, that had already been adjudicated, or that had been disputed.

102. In furtherance of their scheme to obtain money from Ms. Miller by means of false representations, Defendants used the United States Mail in interstate commerce to cause service of the Collection Complaint to be made upon Ms. Miller.

103. In furtherance of their scheme to obtain money from Ms. Miller by means of false representation Defendants used the United States Mail in interstate commerce to demand payment from Ms. Miller in excess of $10,000.00.

104. The debt that was alleged in the Collection Complaint was incurred primarily for personal, family, or household purposes.

105. Documents attached to the Collection Complaint acknowledge that the alleged debt is "consumer credit."

106. The seller of the debt alleged in the Collection Complaint identified the debt as consumer debt.

107. Each Defendant is engaged in a business the principal purpose of which is the collection of debts, or regularly collects or attempts to collect debts owed or due or asserted to be owed or due to others.

108. Each of the Defendants, because of their debt collection activities, is a "debt collector" as described in 15 U.S.C. § 1692a (6).

109. Each of the Defendants, because of their debt collection activities, is a "supplier" as defined in Ohio R.C. § 1345.01(C) and similar consumer protection statutes.

110. Each Defendant regularly takes direct or indirect individual actions to collect "debt" that is described in 15 U.S.C. § 1692a (5).

111. Each action of Defendants that is the subject of this Complaint is an attempt to collect a consumer debt which is subject to the FDCPA.

112. Each action of Defendants that is the subject of this Complaint is a "Consumer Transaction" as defined in Ohio R.C. §1345.01(A) and similar consumer protection statutes.

113. Defendants acting individually and collectively, as a joint venture, made and caused to be made false statements and committed other deceptive or unconscionable acts that are the subject of this Complaint in an attempt to collect a consumer debt from Ms. Miller and other Ohio Consumers who are similarly situated.

114. Defendants falsely asserted in the Collection Complaint that the plaintiff had standing to file the lawsuit based on a valid assignment.

115. Defendants have made similar false assertions of standing, relying on similar knowingly

false statements of material facts in affidavits, in collection complaints in official proceedings filed against other Ohio consumers in other Ohio official proceedings.

116. Defendants filed the Collection Complaint beyond the period of limitation provided under Ohio law for bank loans.

117. Defendants have filed collection complaints in official proceedings against other Ohio consumers beyond the period of limitation provided under Ohio law for bank loans.

118. Each of the Defendants is a person as that term is used in various criminal statutes, including, but not limited to O.R.C. 2921.11, 2921.13; 2921.02, 2905.12 and 2913.02 and 2923.31

119. Angel Miller has legal freedom of choice to refrain from paying a claim to an entity which is not entitled to be paid on the claim.

120. Angel Miller has legal freedom of choice to refrain from paying a claim where the claim is not enforceable for any reason, such as that the claim is asserted at a time after the statute of limitations has expired.

121. In filing its Collection Complaint in an official proceeding in Ohio based on false statements and beyond the statute of limitations, and other conduct listed herein, Defendants were taking action to cause official action to be taken to obtain a judgment and to collect on a debt from Ms. Miller in violation of the prohibition against coercion set forth in O.R.C. 2905.12/ Coercion.

122. The insufficiency of the claim is further established by the absence of timely legally required disclosures.

123. The insufficiency of the claim is further established by the absence of Ms. Miller's signature on the document identified in the Collection Complaint as the "Written Agreement," and which purports to be a "Copy of Original."

124. In spite of these insufficiencies, evident on the face of the documents filed with the Collection Complaint, Defendants nonetheless filed the Collection Complaint.

125. Ms. Miller has suffered damages in the form of injury to person and property as a result of the foregoing actions.

126. Defendants as principal and/or master knowingly authorized, participated in, and/or ratified the actions of others acting on their behalf.

127. Defendants knowingly and intentionally exercised deception in an effort to obtain or exert control over the property of Angel Miller by "utilizing the legal structure" in Ohio in violation of R.C 2913.02(A) and (B).

128. Debt collectors including attorneys engaged in debt collection may be liable as suppliers under the CSPA, *Taylor v. First Resolution Investment Corp*., Ohio Attorney General's Public Inspection File (PIF) No. 3265.

129. Suppliers like Defendants may engage in deceptive and unconscionable consumer sales

practices by filing debt collection lawsuits. *Celebrezze v. United Research, Inc.*, PIF 454.

## Class Allegations

130. Ms. Miller incorporates by reference all allegations of this pleading as if fully rewritten herein.

131. Counts One through Seven are brought on behalf of Ms. Miller and a class of Consumers, similarly situated to Ms. Miller, who have been or may be subjected to one or more of Defendants' unlawful collection related practices.

132. The first class of Consumers consists of all persons against whom Defendants filed, or caused to be filed, a legal action in an Ohio court in the one-year period preceding the filing of this Complaint and thereafter, and the Consumer was subjected to one or more of the actions described in Counts One.

133. The second class of Consumers consists of all persons against whom Defendants filed, or caused to be filed, a legal action in an Ohio court in the two-year period preceding the filing of this Complaint and thereafter, and the Consumer was subjected to one or more of the actions described in Counts Two and Five.

134. The third class of Consumers consists of all persons against whom Defendants filed, or caused to be filed, a legal action in an Ohio court in the four-year period preceding the filing of this Complaint and thereafter, and the Consumer was subjected to one or more of the actions described in Counts Four and Six.

135. The fourth class of Consumers consists of all persons against whom Defendants filed, or caused to be filed, a legal action in an Ohio court in the six-year period preceding the filing of this Complaint and thereafter, and the Consumer was subjected to one or more of the actions described in Count Three.

136. The number of members in each of these classes exceeds forty, and is so numerous that joinder of all members is impracticable.

137. Certification of a class under Ohio Civil Rule 23 is appropriate in that the classes are so numerous that joinder of all members is impracticable, there are questions of law or fact common to the class, the claims of the representative parties are typical of the claims of the class, and the representatives will fairly and adequately protect the interests of the classes.

138. There are questions of law and fact common to the class, including whether Defendants maintained practices, procedures or policies of filing false documents, filing time-barred cases, filing collection cases on behalf of persons who did not possess the right to do so, filing lawsuits on claims previously adjudicated or those that were already pending in court, contacting consumers who were represented by counsel, and whether these practices, procedures and policies violate consumer protection laws, or demonstrate intentional or negligent conduct.

139. These facts present a common nucleus of operative facts from which the common liability issues raised in the Counts in this Complaint may be adjudicated on a class wide basis.

140. Defendants use standardized procedures and practices in their debt collection activity. Therefore, there exists generalized evidence from Defendants' business records, including from their account management and accounting systems, which proves or disproves each element of the claims stated in this Complaint.

141. These common questions of law or fact predominate over any questions affecting only individual members.

142. The claims and defenses of Ms. Miller arise from the same practice or course of conduct described in this Complaint, that gives rise to the claims of other class members, and her claims are based on the same legal theories. The claims and defenses of Ms. Miller are therefore typical of the claims and defenses of the class members.

143. There is no discrepancy between Ms. Miller's position and that of the class. Ms. Miller will fairly and adequately protect the interest of the class. She has a substantial interest in the controversy and has retained experienced counsel who were appointed class counsel in a case involving collection lawsuits filed by this plaintiff. Neither Ms. Miller nor her counsel have any interests which might cause them not to vigorously pursue this action.

144. Each class member's claim is relatively small; thus, it may be impracticable for class members to file individual actions. Also, because Defendants are well-capitalized entities and effective presentation of the causes of action asserted requires significant expense, the interest of members of the class in individually controlling the prosecution or defense of separate actions is minimal.

145. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

146. Defendants institute collection actions and often secure default judgments against individuals and consumers, thus Consumers are unaware of their rights. These facts were acknowledged by the Ohio Supreme Court in *Taylor v. First Resolution Invest. Corp*., 148 Ohio St.3d 627, 2016-Ohio-3444, ¶5. A class action is therefore essential to prevent a failure of justice.

147. Defendants maintain a practice of ignoring their obligations in their debt collection business, and have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole.

148. The evidence needed to adjudicate claims on a class-wide basis is readily available from Defendants' business records. Thus, the difficulties likely to be encountered in the management of this class action are much less than in the case of many types of actions routinely certified, such as class actions for securities fraud or toxic torts.

**Count One - FDCPA**

149. Ms. Miller incorporates all allegations of this pleading as if fully rewritten herein and asserts this count based on all facts set forth above.
150. Defendants are "debt collectors" as defined by the FDCPA, 15 U.S.C. § 1692a(6).
151. Defendants violated the FDCPA through their consumer debt collection activities.
152. Defendants acted individually and as a joint venture for the commission of debt collection violations, which include, but are not limited to, the following:
153. Defendants violated 1692d when they engaged in harassment and abuse.
154. Defendants violated 15 U.S.C. §§ 1692d, 1692e, and 1692f when they filed collection lawsuits against Ms. Miller and class members on claims that were already pending in court or that had already been adjudicated.
155. Defendants violated 15 U.S.C. §§ 1692d, 1692e, and 1692f when they communicated with Ms. Miller and class members, in an attempt to collect debt, without identifying the lawsuit that had previously been filed to collect the same debt.
156. Defendants violated 15 U.S.C. §§ 1692c, 1692d, 1692e, and 1692f when they communicated with Ms. Miller and class members, in an attempt to collect debt, knowing that the consumer was represented by an attorney with respect to such debt.
157. Defendants violated 15 U.S.C. §§ 1692c, 1692d, 1692e, and 1692f when they communicated with Ms. Miller and class members, in an attempt to collect debt, after being informed in writing that the debt was disputed and that it would not be paid to them.
158. Defendants violated 1692e when they threatened lawsuits that they had no intention, authority, or legal ability to file.
159. Defendants violated 1692e when they knowingly sanctioned and permitted the conduct described above by their agents.
160. Defendants violated 15 U.S.C. § 1692e and 1692f when they made false representations, as to the competence of the plaintiff to sue, in lawsuits against Ms. Miller and class members.
161. Defendants violated 15 U.S.C. § 1692e and 1692f when they filed time-barred lawsuits against Ms. Miller and class members.
162. Defendants violated 15 U.S.C. § 1692e and § 1692f when they made false, misleading and/or unfounded representations as to assignment of ownership rights upon which the collection lawsuit was based.
163. Defendants violated 15 U.S.C. § 1692e and § 1692f when they made false, misleading and/or unfounded representations as to authority, capacity and employment relationships of entities executing documents that purported to assign rights upon which the collection lawsuit was based.
164. Defendants violated 15 U.S.C. § 1692e and § 1692f when they made false, misleading

and/or unfounded representations that Ms. Miller and class members had executed written agreements in connection with the debt sought to be collected.

165. Defendants violated 15 U.S.C. § 1692e(8) by reporting or causing to be reported inaccurate credit information, as to the illegally filed lawsuits, which they knew or should have known was false.

166. Defendants violated 15 U.S.C. § 1692e, § 1692f and § 1692d, when they employed a pattern and practice of filing invalid lawsuits, and lawsuits on unenforceable claims with inadequate investigation of the debt before filing the lawsuit, with the use of false documents and false or misleading representations, with the improper motive of cheating unsuspecting or unsophisticated consumers.

167. Ms. Miller and the class suffered damages as a result of Defendants' violations.

168. As a result of the violations of the FDCPA, Defendants are liable to Ms. Miller and the class for declaratory judgment that Defendants' conduct violated the FDCPA, and actual damages, statutory damages, and costs and attorney's fees.

**Count Two - CSPA**

169. Ms. Miller incorporates by reference all allegations of this pleading as if fully rewritten herein and asserts this Count Two based on all the facts set forth above.

170. In an analogous circumstance, the Ohio Supreme Court has held that debt collectors such as the current Defendants are suppliers, and the attempt to collect debt from a consumer such as Ms. Miller is a consumer transaction for the purposes of the CSPA. See, *Taylor v. First Resolution Invest. Corp.*, 2016-Ohio-3444, PIF 3265.

171. In attempting to collect a debt from Ms. Miller and other class members, through the actions described above, including actions described under Count One, Defendants knowingly committed unfair, deceptive and/or unconscionable acts or practices.

172. Said acts and practices were committed by Defendants with a conscious disregard for the rights and safety of the consumer, and had a great probability of causing substantial harm.

173. As a direct and proximate result of such conduct, Ms. Miller and other class members have suffered monetary damage, great aggravation, humiliation, frustration, and inconvenience, and other damages to be proven at the trial of this case.

174. In accordance with O.R.C. §1345.09(D), Ms. Miller seeks a declaratory judgment, an injunction, or other appropriate relief to prevent the practices challenged in this Count.

175. These acts of the Defendants, to violate the CSPA, have been determined by courts of this state to violate Ohio R.C. § 1345.02 or Ohio RC § 1345.03, and were committed by Defendants after such decisions were made available for public inspection under Ohio R.C. § 1345.05(A)(3). Court decisions available for review in the Ohio Attorney General's Public Inspection File (PIF) include, but are not limited to, the following: *Becker v.*

*Montgomery, Lynch*, Case 1:02-cv-874 (U.S. Dist. Ct., N.D. Ohio, 2/3/2003), Ohio AG PIF 10002153, 4/30/2003; *Chesnut v. Progressive Cas. Ins*., 2006-Ohio-2080, Ohio AG PIF# 10002473; *Delawder v. Platinum Financial Services Corp. et al*., Case C-1-04-680 (U.S. Dist. Ct., S.D. Ohio, 3/10/2006), Ohio AG PIF 10002438, 3/11/2006; *Einhorn v. Ford Motor Co.,* 48 Ohio St.3d 27, 29 (1990), Ohio AG PIF 10001113, 10/19/1990; *Ford v. Brewer*, 86AP–626, 1986 WL 14259 (Ohio Ct.App. Dec. 9, 1986), Ohio AG PIF# 10000888; *Foster v. D.B.S. Collection Agency, et al.,* Case 2:01-cv-00514-ALM-TPK (U.S. Dist. Ct., S.D. Ohio, 12/5/2006), Ohio AG PIF 10002518, 12/12/2006; *Gatto v. Frank Nero Auto Lease, Inc*., Ohio Ct. App., 8th District, Case 74894. Ohio AG PIF 10001812, 2/15/2000; *Hagy v. Demers & Adams, LLC*, US Dist. Ct., SDOH, Case 11-CV-530, Ohio AG PIF# 10003210; *Hartman v. Asset Acceptance Corp.*, Case 1:03-cv-113 (U.S. Dist. Ct., S.D. Ohio, 2/7/2006), Ohio AG PIF 10002329, 3/7/2005; *Kelly v Montgomery Lynch*, Case 1:07-CV-919 (U.S. Dist. Ct., N.D. Ohio, 4/15/2008), Ohio AG PIF 10002653, 4/22/2008; *Liggins v. May Company*, 53 Ohio Misc. 21(1977) Ohio AG PIF 10000310; *Motzer v. Ohio Attorney General* (Butler, 1994) 95 Ohio App.3d 183, Ohio AG PIF#10001316; *State ex rel DeWine v. Royal Oak Financial Services, Inc*., Lucas County Common Pleas Court Case CI-2012-5440, Ohio AG PIF# 10003097; *State ex rel DeWine v. Universal Debt and Payment Solutions, Inc*., (Jan. 29, 2016), Case No. CV -15-845782, Cuyahoga County Common Pleas Court, Ohio AG PIF #3259; *State ex rel. Celebrezze v. Scandinavian Health Spa*, Summit County Court of Common Pleas, Case CV863-1158, Ohio AG PIF 10000744, 4/10/1986; *Taylor v. First Resolution Invest. Corp*., 2016-Ohio-3444, Ohio AG PIF# 3265; *Walker v. Dominion Homes, Inc*., 2005–Ohio-6055, Ohio AG PIF# 10002405; *D.A.N. Joint Venture III, L.P. v. Armstrong*, 2007-Ohio-898, Ohio AG PIF# 10003148; *Midland Funding LLC v. Brent*, Case 08-CV-1434 (U.S. Dist. Ct., N.D. Ohio 8/19/2009) Ohio AG PIF# 10002800; *State ex rel DeWine v. Rotech Holdings Ltd*, Ohio AG PIF# 3269, 8/1/2016; *Bennett v. Tri-State Collection Service*, Ohio AG PIF# 10000437, 11/5/1979; *Centran Bank of Akron v. Hamilton*, Ohio AG PIF# 10000931, 4/29/1989; *State of Ohio v. Nationwide Recovery Group LLC*, Ohio AG PIF# 3442.

## Count Three – Commission of Criminal Acts and Fraud

176. Ms. Miller incorporates by reference all allegations of this pleading as if fully rewritten herein and asserts this Count Three based on all the facts set forth above.
177. This Count Three is asserted against all Defendants except Javitch and Wodzisz, hereafter "Non-Javitch Defendants."
178. Non-Javitch Defendants have created and submitted false affidavits (often labelled as "Affidavit of Claim") with collection complaints filed against Ms. Miller and other class members.
179. In such affidavits, the affiants falsely purport to have a title, employment status, or agency that the affiant does not possess.

180. In such affidavits, the affiants falsely purports to execute the affidavit on behalf of entities that have not given the affiant such authority.

181. Each false statement of each such affiant was made under oath, duly and legally administered by a person authorized by law to administer oaths and under circumstances indicating that the affiant by his/her unequivocal and present act took upon himself or herself the obligation of an oath.

182. Each such affiant knew at the time he or she made each false statement that each such statement was, indeed, false.

183. Non-Javitch Defendants induced each such affiant to make the false statements as a condition of his/her employment and part of his/her employment duties with the knowledge and intent that each false statement he/she made would be filed, and was made to be filed, in official proceedings in Ohio and were in fact filed in official proceedings in Ohio.

184. Non-Javitch Defendants filed with Ohio courts the false affidavits with knowledge of its falsity or in reckless disregard of the truth.

185. The false statements in the affidavits are material to the questions of standing, as well as to the statement of the debt claimed to be due, in an official proceeding in Ohio.

186. In preparing and obtaining the sworn affidavit of affiants, Non-Javitch Defendants acted with the purpose to corrupt the affiant and improperly influence the affiant with respect to the affiant's testimony in an official proceeding, offering for such influence a valuable benefit including but not limited to a paycheck or continued employment.

187. Non-Javitch Defendants violated Ohio and Federal criminal statutes, as well as the common law, in committing acts of perjury, subornation of perjury, corruption of a witness, theft, falsification, tampering with evidence, extortion, intimidation, receiving stolen property, engaging in a pattern of corrupt activity, mail fraud and wire fraud when they employed a pattern and practice of filing invalid, unjustified lawsuits, with inadequate investigation of the debt before filing the lawsuit, with the use of false documents and false or misleading representation, with the improper motive of cheating unsuspecting or unsophisticated consumers.

188. The pattern of pressuring payments through false statements, initiating invalid lawsuits; and using official proceedings to enforce judgments obtained through invalid lawsuits based on false statements is a pattern of corrupt activity involving multiple acts in violation of multiple criminal statutes.

189. The corrupt activity described herein involves multiple incidents of corrupt activity that are related to the affairs of the same debt-collection enterprise, are not isolated, and are not so closely related to each other, and connected in time and place that they constitute a single event.

190. Repeated such incidents have occurred over the last six years prior to the date of the

incidents related to Ms. Miller.

191. The pattern of corrupt activity between and among Non-Javitch Defendants and other individuals and entities, such as but not limited to, affiants from other entities, constitutes acts through a group of persons associated together for the common purpose of engaging in a course of conduct as an association-in-fact enterprise.

192. Each Non-Javitch Defendant is employed by or associated with an enterprise and through that enterprise conducts or participates in the affairs of the enterprise through a pattern of corrupt activity.

193. Each Non-Javitch Defendant through a pattern of corrupt activity and in association with the enterprise, has acquired and maintained an interest in and control of an enterprise.

194. Each Non-Javitch Defendant knowingly has received proceeds derived from a pattern of corrupt activity and has invested those proceeds into the operation of the enterprise and, on information and belief, to acquire control of or interest in real property.

195. Each Non-Javitch Defendant through receipt of funds through coerced settlements, or official proceedings, knowingly has received stolen property.

196. Ms. Miller has been injured in person and property, including personal injury and pecuniary loss, by the criminal acts of Non-Javitch Defendants and is entitled to compensatory damages for such injury, as well as costs and attorney fees, treble damages, and punitive damages.

197. Non-Javitch Defendants through their criminal acts of deception in official proceedings, as set forth in this Complaint, have attempted to obtain or obtained payments and collection through consent decrees, default judgments and judgments with the purpose to knowingly deprive the true owners of their property or services without their consent or through deception.

198. The criminal acts complained of are done with a purpose to coerce Ms. Miller, and others similarly situated, into taking action to pay a debt not owed, or not owed to the entity named in the collection complaint, or not enforceable through legal action, by threatening or causing official actions such as judgments, judgment liens, bank attachments, and wage garnishments.

199. Non-Javitch Defendants conduct such criminal acts with the purpose to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of corrupt activity.

200. These Defendants' conduct is done with the purpose to coerce Ms. Miller and other class members to take action, such as to offer and/or pay money to settle such claim where Ms. Miller and others have or had the legal freedom of choice to refrain from paying, and this constitutes the crime of coercion.

201. These Defendants' conduct is done with the purpose to threaten or cause official action to be taken with respect to those claims, such as judgments and execution thereon, where

Ms. Miller and others have or had the legal freedom of choice to refrain from paying and this constitutes the crime of coercion.

202. Non-Javitch Defendants with the purpose to corrupt or improperly influence with promises of valuable things not limited to compensation, paychecks, or continued employment, caused affiants to make false sworn statements for use in official proceedings, and thereby corrupted witnesses.

203. These Defendants' knowing false statements of right to collect on a purported claim of indebtedness against Ms. Miller, made in an official proceeding to mislead a judge in his or her official function, with the purpose to deprive Ms. Miller and other class members of property without their consent by deceptions is the crime of falsification.

204. The affidavits were made by a person before a notary authorized to administer oaths and made knowingly false statements under oath of material facts in violation of the prohibition against perjury.

205. Non-Javitch Defendants induced or procured the perjured testimony of affiants in violation of the prohibition against subornation of perjury.

206. These Defendants conspired with affiants in the commission of the crimes described above and engaged in a pattern of corrupt activity.

207. In engaging in settlement discussions with defendants of collection complaints to coerce payment of the claim based on threat of, or misrepresentation regarding, liability on the Collection Complaint, these Defendants conducted or attempted to conduct a transaction with the purpose to promote, manage, establish, carry on, or facilitate the promotion, management, establishment or carrying on of corrupt activity.

208. Non-Javitch Defendants with the purpose to obtain a valuable benefit in the form of payment of money through settlement, bank attachment, or wage garnishment exposed and threatened to expose Ms. Miller to debt collection activity which activity damaged her personal financial affairs and caused her trepidation, fear of exposure and embarrassment at her place of employment  and impaired her ability to obtain credit.

209. These actions of Non-Javitch Defendants demonstrate malice and or aggravated or egregious fraud including but not limited to fraud upon the court.

210. Non-Javitch Defendants as principal or master, knowingly authorized, participated in, or ratified the acts of their agent, employee or servant in perjury and falsification.

211. Non-Javitch Defendants engaged in perjury and falsification.

212. As a result of these Defendants' acts of malice and fraud, and as a result of these Defendants' knowing perjury and falsification as well as authorization of, participation in and ratification of the acts of their agent, employee or servant in perjury and falsification Ms. Miller is entitled to punitive damages under the statutes and common law of Ohio.

## Count Four - Fraud

213. Ms. Miller incorporates by reference all allegations of this pleading as if fully rewritten herein and asserts this Count Four based on all the facts set forth above.

214. Defendants committed fraud on Ohio courts and on Ohio consumers, including Ms. Miller, by intentionally or with reckless disregard for the truth:

   a. Misrepresenting or concealing the identity of the real party in interest in collection lawsuits filed in Ohio courts.

   b. Misrepresenting the chain of title of the debt claimed in collection lawsuits filed in Ohio, in complaints and supporting documents filed in Ohio courts.

   c. Misrepresenting the status of the creditor of the debt alleged in the lawsuits.

   d. Misrepresenting or concealing the fact that the debt claimed due was the subject of a previous lawsuit.

215. Such false representations were made to courts, Ms. Miller and the class.

216. Such false representations were made in pleadings and other documents filed in Ohio courts, including the Collection Complaint filed against Ms. Miller,

217. The dates, times and place of each such false representation are documented in the court cases filed by the Defendants, including this case filed against Ms. Miller.

218. Other such false representations were made in communications sent to consumers, including the July 18, 2024, letter sent to Ms. Miller. Exhibit 1.

219. Defendants knew of the falsity of these representations or acted in reckless disregard of the truth in making the false representations.

220. Defendants made such false representations with the purpose and intention to mislead the courts and to create the false impression that Defendants had met requirements of court rules, thereby depriving the litigation of its legitimacy.

221. Defendants also made such false representations with the purpose and intention to mislead Ms. Miller and the class.

222. Ms. Miller, the class and the courts were justified in relying upon such representations and did so rely through action or inaction upon receipt of the misrepresentations. Actions include engaging legal counsel and other litigation related activities; inaction includes accepting judgments by default because of financial inability to defend or because of having been misled as to the validity and enforceability of the debt or other false representations.

223. Ms. Miller and the class suffered damages, through loss of resources, as a proximate result of such reliance.

## Count Five – Negligence

224. Ms. Miller incorporates by reference all allegations of this pleading as if fully rewritten herein and asserts this Count Five based on all the facts set forth above.

225. Defendants negligently failed to ensure that the documents filed in collection lawsuits, against Ms. Miller and the class, were signed by authorized persons. As a result, Ms. Miller and the class have suffered damages.

226. Defendants negligently failed to ensure that Collection Complaints, against Ms. Miller and the class, were filed within the period of limitations allowed by Ohio law. As a result, Ms. Miller and the class have suffered damages.

227. Defendants negligently failed to ensure that Collection Complaints, against Ms. Miller and the class, were filed in the name of persons competent to do so under Ohio law. As a result, Ms. Miller and the class have suffered damages.

228. Defendants negligently failed to ensure that they did not directly contact consumers who were represented by counsel. As a result, Ms. Miller and the class have suffered damages.

229. Defendants negligently failed to ensure that Collection Complaints were not filed on claims that were already pending in court or that has already been adjudicated. As a result, Ms. Miller and the class have suffered damages.

230. Defendants negligently failed to ensure that consumers were not asked to dispute debts they had already disputed. As a result, Ms. Miller and the class have suffered damages.

231. Defendants negligently failed to ensure that personal and private information of Ms. Miller and other class members was not obtained or disseminated without legal authority. As a result, Ms. Miller and the class have suffered damages.

232. UHG and Javitch negligently failed to supervise Wodzisz and other employees and agents in the filing of collection lawsuits or contacting consumers under the circumstances described above. As a result, Ms. Miller and the class have suffered damages.

## Count Six - Civil Conspiracy

233. Ms. Miller incorporates all allegations of this pleading as if fully rewritten herein and asserts this Count Six based on all the facts set forth above.

234. Defendants maliciously combined to create joint collection platforms and strategies and acted in concert, with each other and with other collection firms like Javitch, under an agreement to commit the unlawful acts described above, and to initiate lawsuits in an unlawful manner, all to cause harm to Ms. Miller and to Ohio consumers in a way not competent for one acting alone.

235. In accordance with agreement, plan or understanding, one or more of the Defendants did commit the above-described unlawful acts against Ms. Miller and the class., as well as additional tortious conduct set forth herein against Ms. Miller and the class.

236. Ms. Miller and the class suffered injury as a result of these actions.

237. Defendants therefore committed the tort of civil conspiracy.

## Count Seven – Other Causes of Action

238. Ms. Miller incorporates all allegations of this pleading as if fully rewritten herein and asserts this Count Seven based on all the facts set forth above.

239. Ohio precedent states that: "There is no requirement for a party to plead the legal theory of recovery, and it is sufficient for the pleader to set forth facts which, if proven, establish their claim for relief." *Tennant v. Huntington Natl. Bank*, 2020-Ohio-4063, Para. 15 (8th Dist.), citing *Illinois Controls v. Langham*, 70 Ohio St.3d 512, 526, 1994-Ohio-99, 639 N.E.2d 771.

240. In accordance with this controlling law, Ms. Miller states that she asserts all causes of action in addition to those specifically cited above that are based on the facts pleaded above and related facts that may be discovered during the progress of this case, which, if proven at trial, may establish a claim for relief for herself and for a class of consumers she seeks to represent.

## Damages

241. Ms. Miller and the class suffered damages as a result of Defendants' violations of the law.

242. As described above, Ms. Miller has expended money and time in connection with and in response of the Collection Case.

243. As described above, Ms. Miller has suffered confusion, anxiety, exposure to humiliation, embarrassment in her private social life as well as her workplace, trepidation, and fear of exposure at her workplace as a result of Defendants' wrongful collection actions.

244. Ms. Miller and each member of the class described above have been or may be injured by Defendants' unlawful acts and practices, in one or more of the following ways:

    a. Monetary, emotional distress, aggravation, embarrassment, shame, humiliation, injury to reputation or credit injuries.
    b. Expenditure of money, time or effort in resisting Defendants' illegal actions, including payment of attorney fees.
    c. Creation of an unlawful and fictitious indebtedness, for which the consumer is ostensibly liable.
    d. Payment of the charges which are unreasonable, unnecessary or a penalty.
    e. Coerced payment of settlements and/or judgements unlawfully obtained through the conduct described herein.

WHEREFORE, Ms. Miller respectfully requests that judgment be entered against Defendants for the following:

a. Certify a class and appoint Ms. Miller as class representative and the undersigned counsel as class counsel.

b. Award statutory, punitive, and compensatory and, treble damages. To comply with Civil Rule 8(A), Ms. Miller states that relief sought in the Complaint, including class relief, may exceed $25,000.00.

c. Provide injunctive relief to the class restraining Defendants from filing collection cases with false documents, including falsely sworn affidavits, filing time-barred cases, filing cases based on unenforceable debts, filing cases without a right to do so, filing cases on behalf of persons incompetent to do so, or attempting to collect debt from the persons subjected to such unlawful conduct.

d. Order Defendants to establish procedures which will prevent attempts or actions to collect debt through conduct, as alleged in this case.

e. Order Defendants to operate according to procedures which will prevent attempts or actions to collect debt through conduct, as alleged in this case.

f. Award punitive damages

g. Award attorney's fees, costs, and expenses.

h. Award any other relief to which Ms. Miller and the class may be entitled to in law or equity.

i. Make declaratory judgments and order such other and further relief as may be just and proper, including under O.R.C. §2923.34 and §2721.02. However, nothing in this paragraph or elsewhere in this Complaint should be construed as seeking a declaration, from this court, as to any rights that were previously adjudicated by another court, or a determination that a judgment of another court be vacated or declared void. Any such construction is expressly and undeniably disavowed and disclaimed by Ms. Miller.

Respectfully submitted,

/s/Susan M. Gray
Susan M. Gray (#0062356)
Flagstar Bank Building
22255 Center Ridge Rd. Suite 106
Rocky River, OH 44116
(440) 331-3949
(440) 331-8160 fax
smgray@smgraylaw.com

Anand N. Misra (#0067594)
The Misra Law Firm, LLC
3659 Green Road, Suite 100
Beachwood, Ohio 44122
(216) 752-3330

misraan@misralaw.com

Attorneys for Plaintiff Ms. Miller

**Jury Trial Demand**

Plaintiff respectfully demands a jury trial on all issues raised in her Complaint.

Respectfully submitted,

/s/Susan M. Gray

Susan M. Gray (#0062356)
Flagstar Bank Building
22255 Center Ridge Rd. Suite 106
Rocky River, OH 44116
(440) 331-3949
(440) 331-8160 fax
smgray@smgraylaw.com

Anand N. Misra (#0067594)
The Misra Law Firm, LLC
3659 Green Road, Suite 100
Beachwood, Ohio 44122
(216) 752-3330
misraan@misralaw.com

Attorneys for Plaintiff Ms. Miller

JB
JAVITCH BLOCK
*A Limited Liability Company*

1100 Superior Avenue, 19th Floor
Cleveland, Ohio 44114-2521
O: 216-623-0000
F: 216-623-0190
Toll Free: 866-881-2400

July 18, 2024

To: Angel Miller
2011 Good Hope New Holland Rd
New Holland, Oh 43145

Javitch Block LLC
1100 Superior Avenue
Cleveland, OH 44114-2521
Phone: (800) 837-4601 from Monday through Friday: 8am to 5pm EST
www.jbllc.com

**Reference: 2186039**

**Javitch Block LLC is a debt collector.** We are trying to collect a debt that you owe to UHG I LLC; we will use any information you give us to help collect the debt.

**Our information shows:**

| | | |
|---|---|---|
| You had a financial obligation with LendingClub Corporation with account number *****0160. | | |
| As of February 13, 2020, you owed | | $12,630.90 |
| Between February 13, 2020 and today: | | |
| You were charged this amount in interest: | + | $0.00 |
| You were charged this amount in fees: | + | $0.00 |
| You paid or were credited this amount toward the debt: | - | $0.00 |
| **Total amount of the debt now:** | | $12,630.90 |

**How can you dispute the debt?**

- **Call or write to us by August 27, 2024, to dispute all or part of the debt.** If you do not, we will assume that our information is correct.
- **If you write to us by August 27, 2024,** we must stop collection on any amount you dispute until we send you information that shows you owe the debt. You may use the form below or write to us without the form. You may also include supporting documents. We accept disputes electronically at **https://www.jbllc.com/contact/cleveland**.

**What else can you do?**

- **Write to ask for the name and address of the original creditor, if different from the current creditor.** If you write by August 27, 2024, we must stop collection until we send you that information. You may use the form below or write to us without the form. We accept such requests electronically at **https://www.jbllc.com/contact/cleveland**.
- **Go to www.cfpb.gov/debt-collection to learn more about your rights under federal law.** For instance, you have the right to stop or limit how we contact you.
- Contact us about your payment options.
- Póngase en contacto con nosotros para solicitar una copia de este formulario en español.

**Notice:** **See reverse for important information.**

---

**Mail this form to:**
Javitch Block LLC
1100 Superior Avenue
Cleveland, OH 44114-2521

Angel Miller
2011 Good Hope New Holland Rd
New Holland, Oh 43145

**How do you want to respond?**
***Check all that apply***

☐ **I want to dispute the debt because I think:**
  ☐ This is not my debt
  ☐ The amount is wrong.
  ☐ Other (please describe on reverse or attach additional information).

☐ **I want you to send me the name and address of the original creditor.**

☐ **I enclosed this amount:** $ ______
Make your check payable to *Javitch Block LLC*. Include the reference number 2186039

☐ **Quiero este formulario en español**

* Q - - - 2 1 8 6 0 3 9 D M D - 1 - *

IMPORTANT CONSUMER INFORMATION GENERALLY:
State specific disclosures provided below are not intended to imply that Javitch Block LLC engages in retail consumer debt collection activities in each state listed.

IF YOU ARE IN BANKRUPTCY OR HAVE BEEN DISCHARGED IN BANKRUPTCY, THIS LETTER IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT INTENDED AS AN ATTEMPT TO COLLECT A DEBT OR AS AN ACT TO COLLECT, ASSESS, OR RECOVER ALL OR ANY PORTION OF THE DEBT FROM YOU PERSONALLY.

NOT ALL OUR EMPLOYEES ARE ATTORNEYS AND NOT ALL COMMUNICATIONS FROM US ARE FROM OUR ATTORNEYS. UNLESS YOU RECEIVED A COMMUNICATION FROM ONE OF OUR ATTORNEYS, THIS COMMUNICATION IS WITH US ACTING SOLELY AS DEBT COLLECTORS, NOT ATTORNEYS, REGARDING YOUR ACCOUNT.

WE ENDEAVOR TO PROVIDE YOU WITH ACCURATE FINANCIAL INFORMATION AT ALL TIMES AS OF THIS DATE, THE AMOUNT YOU OWE WILL BE DISPLAYED ON PAGE ONE OF THIS LETTER. BECAUSE COMPONENTS OF THE CURRENT BALANCE MAY VARY FROM DAY TO DAY, THE AMOUNT DUE ON THE DAY YOU PAY MAY BE GREATER. HENCE, IF YOU PAY THE AMOUNT SHOWN ON PAGE ONE AND A COMPONENT AMOUNT OF THE CURRENT BALANCE CHANGES AFTER THIS DATE (E.G., INTEREST, IF APPLICABLE), AN ADJUSTMENT MAY BE NECESSARY AFTER WE RECEIVE YOUR CHECK, IN WHICH EVENT WE WILL INFORM YOU BEFORE DEPOSITING THE CHECK FOR COLLECTION. FOR FURTHER INFORMATION, WRITE US OR CALL US.

STATE SPECIFIC CONSUMER INFORMATION
CALIFORNIA RESIDENTS:
The state Rosenthal Fair Debt Collection Practices Act and the federal Fair Debt Collection Practices Act require that, except under unusual circumstances, collectors may not contact you before 8 a.m. or after 9 p.m. They may not harass you by using threats of violence or arrest or by using obscene language. Collectors may not use false or misleading statements or call you at work if they know or have reason to know that you may not receive personal calls at work. For the most part, collectors may not tell another person, other than your attorney or spouse, about your debt. Collectors may contact another person to confirm your location or enforce a judgment. For more information about debt collection activities, you may contact the Federal Trade Commission at 1-877-FTC-HELP or www.ftc.gov.

COLORADO RESIDENTS:
A consumer has the right to request in writing that a debt collector or collection agency cease further communication with the consumer. A written request to cease communication will not prohibit the debt collector or collection agency from taking any other action authorized by law to collect the debt. FOR INFORMATION ABOUT THE COLORADO FAIR DEBT COLLECTION PRACTICES ACT, See http://WWW.COAG.GOV/CAR

MASSACHUSETTS RESIDENTS:
NOTICE OF IMPORTANT RIGHTS: You have the right to make a written or oral request that telephone calls regarding your debt not be made to you at your place of employment. Any such oral request will be valid for only ten days unless you provide written confirmation of the request postmarked or delivered within seven days of such request. You may terminate this request by writing to the debt collector. Our telephone number is (866)-881-2400. And our office hours are Monday through Friday 8AM-5PM (Eastern Time).

NEW YORK RESIDENTS:
Debt collectors, in accordance with the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq., are prohibited from engaging in abusive, deceptive, and unfair debt collection efforts, including but not limited to: (i) the use or threat of violence; (ii) the use of obscene or profane language; and (iii) repeated phone calls made with the intent to annoy, abuse, or harass. If a creditor or debt collector receives a money judgment against you in court, state and federal laws may prevent the following types of income from being taken to pay the debt:(1) Supplemental security income, (SSI); (2) Social security; (3) Public assistance (welfare); (4) Spousal support, maintenance (alimony) or child support; (5) Unemployment benefits; (6) Disability benefits; (7) Workers' compensation benefits; (8) Public or private pensions; (9) Veterans' benefits; (10) Federal student loans, federal student grants, and federal work study funds; and (11) Ninety percent of your wages or salary earned in the last 60 days. You may request this letter in an alternative, reasonably accommodatable format such as large print, braille, audio compact disc, or other means, and you may call us at (866) 881-2400 to make such a request.

NEW YORK CITY RESIDENTS:
This collection agency is licensed by the New York City Department of Consumer Affairs, License No. 1330441. PLEASE CONTACT JAMES OH WITH ANY QUESTIONS OR CONCERNS AT (866) 881-2400. Javitch Block LLC does not provide language access services

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Consumer Financial Protection Bureau,<br><br>Plaintiff,<br><br>v.<br><br>Craig Manseth, Jacob Adamo, Darren Turco, United Debt Holding LLC, JTM Capital Management, LLC, UHG, LLC, UHG I LLC (also known as United Holding Group), and UHG II LLC (collectively holding themselves out as United Holding Group, United Holding Group, LLC, and United Holdings Group, LLC)<br><br>Defendants. | Case No. 1:22-cv-29<br><br>**AMENDED COMPLAINT** |

The Consumer Financial Protection Bureau (Bureau) brings this action against Defendants Craig Manseth; Jacob Adamo; Darren Turco; United Debt Holding LLC (UDH); JTM Capital Management, LLC (JTM); and UHG, LLC, UHG I LLC (doing business as United Holding Group), and UHG II LLC, collectively holding themselves out as United Holding Group, United Holding Group, LLC, and United Holdings Group, LLC, and referred to herein collectively as “UHG,” and alleges as follows:

## INTRODUCTION

1. UDH, JTM, and UHG are debt collectors that have purchased defaulted consumer debt worth tens of millions of dollars. They place the debt portfolios they purchase with, or sell them to, other debt collection companies.

2. Since at least 2014, UDH, JTM, and UHG have knowingly or recklessly placed and sold debts to debt collection agencies that used threats and misrepresentations to coerce payments from consumers.

3. Craig Manseth, Darren Turco, and Jacob Adamo (collectively "Individual Defendants") directed or controlled the unlawful conduct of UDH, JTM, and UHG and also participated directly in the unlawful conduct of UDH, JTM, and UHG.

4. Manseth owned and managed UDH, a debt buyer in Colorado.

5. Turco was Executive Vice President for UDH, reporting to Manseth.

6. Adamo owned and managed JTM, a debt buyer based in this district.

7. The Individual Defendants joined forces to create and operate UHG, a debt buyer based in this district. UHG then took over the ongoing business of UDH and JTM.

8. The Defendants knew or should have known the debt collection agencies with which they placed and sold debt were making false threats and false

statements to consumers. But, despite that knowledge, they continued to place and sell debts to them.

9. Defendants' illegal practices violated the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531(a), 5536(a)(1), 5536(a)(3).

10. Defendants UHG and JTM's practices also violated the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692-1692p.

## JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

12. Venue is proper in this district because Defendants do business here. 12 U.S.C. § 5564(f).

## PARTIES

13. The Bureau is an independent agency of the United States charged with regulating the offering and provision of consumer-financial products and services under Federal consumer financial laws. 12 U.S.C. § 5491(a). The Bureau has independent litigating authority to enforce Federal consumer financial laws, including the CFPA and the FDCPA. 12 U.S.C. §§ 5564(a)-(b); 5481(12), (14).

## UDH

14. UDH is a Delaware limited-liability company with its principal place of business at 383 Inverness Parkway, Suite 280, Englewood, Colorado.

15. The principal purpose of UDH's business was collecting on debt.

16. UDH purchased portfolios of defaulted consumer debt worth millions of dollars for a small fraction of their outstanding balance. UDH then placed the portfolios with or sold them to other debt-collection companies, and some of those debt-collection companies in turn placed or sold the portfolios to downstream debt collection companies and on down the line (collectively, "Debt Collectors").

17. The Debt Collectors that UDH placed debt with collected the defaulted consumer debts on UDH's behalf.

18. Most of the debts UDH purchased, collected on, and sold were primarily for use by consumers for personal, family, or household purposes.

19. Many of the debts UDH purchased, collected on, and sold were for extensions of credit, such as payday loans, sub-prime credit cards, online installment loans, and auto loans.

20. From at least 2014 through at least mid-2018, UDH engaged in the business of debt collection in this district.

21. UDH entered agreements for the provision of debt-collection services that occurred at least in part in this district.

22. Debt Collectors located in this district collected debt from consumers on behalf of UDH.

23. UDH has also engaged in the business of debt collection throughout the United States.

24. The activities described in Paragraphs 14 through 23, above, are "consumer financial products or services" under the CFPA, 12 U.S.C. § 5481(5), (15)(A)(i), (15)(A)(x)

25. UDH is a "covered person" under the CFPA. 12 U.S.C. § 5481(6).

**JTM**

26. JTM is a Delaware limited-liability company with its principal place of business in this district at 6400 Sheridan Drive, Suite 138, Williamsville, New York.

27. The principal purpose of JTM's business is collecting on debt.

28. The majority of JTM's revenue was from debt collection.

29. JTM purchased portfolios of defaulted consumer debt worth millions of dollars for a small fraction of their outstanding balance and then placed the portfolios with or sold them to other Debt Collectors. Some of those Debt Collectors in turn placed or sold the portfolios to downstream Debt Collectors.

30. The companies that JTM placed debt with collected the defaulted consumer debts on JTM's behalf.

31. Most of the debts JTM purchased, collected on, and sold were primarily for use by consumers for personal, family, or household purposes.

32. Many of the debts JTM purchased, collected on, and sold were for extensions of credit, such as payday loans, sub-prime credit cards, online installment loans, and auto loans.

33. From at least 2015 to at least 2019, JTM engaged in the business of debt collection in this district.

34. JTM entered agreements in this district for the provision of debt-collection services that occurred at least in part in this district.

35. Debt Collectors located in this district collected debt from consumers on behalf of JTM.

36. JTM also engaged in the business of debt collection throughout the United States.

37. The activities described in Paragraphs 26 through 36, above, are "consumer financial products or services" under the CFPA, 12 U.S.C. § 5481(5), (15)(A)(i), (15)(A)(x).

38. JTM is a "covered person" under the CFPA. 12 U.S.C. § 5481(6).

## UHG

39. UHG, LLC is a Delaware limited-liability company with its principal place of business in this district at 6400 Sheridan Drive, Suite 138, Williamsville, New York.

40. UHG I LLC is a Delaware limited-liability company with its principal place of business at 6400 Sheridan Drive, Williamsville, New York, and does business under the assumed name of "United Holding Group."

41. UHG II LLC is a Delaware limited-liability company with its principal place of business at 6400 Sheridan Drive, Williamsville, New York.

42. At all times relevant, UHG, LLC, UHG I LLC, and UHG II LLC have done business, and continue to do business, under the names "United Holding Group," "United Holding Group, LLC," and "United Holdings Group, LLC."

43. The principal purpose of UHG's business is collecting on debt.

44. The majority of UHG's revenue was from debt collection.

45. UHG bought portfolios of defaulted consumer debt worth millions of dollars for a small fraction of their outstanding balance and then placed the portfolios with or sold them to other Debt Collectors. Some of those Debt Collectors in turn placed or sold the portfolios to downstream Debt Collectors.

46. The Debt Collectors that UHG placed debt with collected the defaulted consumer debts on UHG's behalf.

47. Most of the debts UHG purchased, collected on, and sold were primarily for use by consumers for personal, family, or household purposes.

48. Many of the debts UHG purchased, collected on, and sold were for extensions of credit, such as payday loans, sub-prime credit cards, online installment loans, and auto loans.

49. From at least 2017 to the present, UHG engaged in the business of debt collection in this district.

50. UHG entered agreements in this district for the provision of debt-collection services that occurred at least in part in this district.

51. Debt Collectors located in this district collected debt from consumers on behalf of UHG.

52. UHG also engaged in the business of debt collection throughout the United States.

53. The activities described in Paragraphs 39 through 52, above, are "consumer financial products or services" under the CFPA, 12 U.S.C. § 5481(5), 15(A)(i), 15(A)(x).

54. UHG is a "covered person" under the CFPA. 12 U.S.C. § 5481(6).

**Manseth**

55. Craig Manseth resides in Parker, Colorado.

56. In 2008, Manseth founded UDH, which he owned and operated.

57. At all relevant times, Manseth has served as Chief Executive Officer and President of UDH.

58. From at least 2014, and at all relevant times, Manseth had managerial responsibility for UDH and materially participated in UDH's affairs.

59. Manseth determined which debt portfolios UDH purchased, which Debt Collectors bought debt from UDH or collected on debt for UDH, and which Debt Collectors were terminated.

60. Manseth negotiated the terms and prices for UDH's purchase and collections agreements and communicated with Debt Collectors and original creditors about consumer complaints, which included handling escalated complaints.

61. Manseth developed UDH's business strategies and practices and oversaw UDH's workforce.

62. Due to the size and structure of UDH and Manseth's roles in operating the company, Manseth knew or should have known that UDH was engaging in the violations described herein.

63. Manseth is also a founder, Co-Chief Executive Officer, and Chief Financial Officer of UHG.

64. Since 2017, Manseth has had managerial responsibility for UHG and has materially participated in its affairs.

65. Manseth, along with Turco and Adamo, determined which debt portfolios UHG purchased.

66. Manseth determined which Debt Collectors bought debt from UHG.

67. Manseth negotiated financing for UHG and signed binding documents on behalf of UHG.

68. Manseth, along with Turco and Adamo, developed UHG's business strategies and practices and oversaw UHG's workforce.

69. Due to the size and structure of UHG and Manseth's roles in operating the company, Manseth knew or should have known that UHG was engaging in the violations described herein.

70. Manseth is a "related person" under the CFPA. 12 U.S.C. § 5481(25)(C)(i), (ii). Because Manseth is a "related person," he is deemed a "covered person" for purposes of the CFPA. 12 U.S.C. § 5481(25)(B).

71. Through UDH and UHG, Manseth has conducted business in this district from at least 2014 to the present.

**Adamo**

72. Adamo resided in this district, in Pendleton, New York at all times relevant to this complaint.

73. Adamo is the founder and an operator and owner of JTM.

74. Since at least 2014, Adamo has had managerial responsibility for JTM

and has materially participated in its affairs.

75. Adamo:

a. developed JTM's business strategies and practices;

b. monitored Debt Collectors' activities and compliance, which included handling escalated complaints; and

c. oversaw JTM's workforce.

76. Due to the size and structure of JTM and Adamo's roles in operating the company, he knew or should have known that JTM was engaging in the violations described herein.

77. Adamo is also a founder, Co-Chief Executive Officer, and Chief Operations Officer of UHG.

78. Since 2017, Adamo has had managerial responsibility for UHG and has materially participated in its affairs.

79. Adamo, along with Manseth and Turco, determined which debt portfolios UHG purchased.

80. Adamo determined which Debt Collectors collected on debt for UHG and which Debt Collectors were terminated.

81. Adamo, along with Turco, monitored Debt Collectors' activities and compliance, which included handling escalated complaints, on behalf of UHG.

82. Adamo, along with Manseth and Turco, developed UHG's business

strategies and practices and oversaw UHG's workforce.

83. Due to the size and structure of UHG and Adamo's roles in operating the company, Adamo knew or should have known that UHG was engaging in the violations described herein.

84. Adamo is a "related person" under the CFPA. 12 U.S.C. 5481(25)(C)(i), (ii). Because Adamo is a "related person," he is deemed a "covered person" for purposes of the CFPA. 12 U.S.C. 5481(25)(B).

85. Through JTM and UHG, Adamo has conducted business in this district from at least 2014 to the present.

**Turco**

86. Darren Turco resides in Parker, Colorado.

87. Prior to 2017, Turco was employed by UDH as its Executive Vice President, where he reported to Manseth and assisted with managing compliance issues relating to Debt Collectors.

88. Turco is a founder and Co-Chief Executive Officer of UHG.

89. Since 2017, Turco has had managerial responsibility for UHG and has materially participated in its affairs.

90. Turco, along with Manseth and Adamo, determined which debt portfolios UHG purchased.

91. Turco, along with Adamo, monitored Debt Collectors' activities and

compliance, which included handling escalated complaints, on behalf of UHG.

92. Turco communicated with original creditors on behalf of UHG about consumer complaints.

93. Turco, along with Manseth and Adamo, developed UHG's business strategies and practices and oversaw UHG's workforce.

94. Due to the size and structure of UHG and Turco's roles in the company, Turco knew or should have known that UHG was engaging in the violations described herein.

95. Turco is a "related person" under the CFPA. 12 U.S.C. 5481(25)(C)(i), (ii). Because Turco is a "related person," he is deemed a "covered person" for purposes of the CFPA. 12 U.S.C. 5481(25)(B).

96. Through UHG, Turco has conducted business in this district from at least 2017 to the present.

## FACTS

### Background on UDH

97. From its inception, Manseth used UDH to purchase millions of dollars in defaulted consumer debt for pennies on the dollar.

98. Beginning in or before 2014, UDH's primary lines of business were placing consumer debt with and selling consumer debt to other Debt Collectors.

99. In some situations, UDH placed its debt with Debt Collectors called

"master servicers," who then placed it with other Debt Collectors that collected the debts on UDH's behalf and with UDH's knowledge.

100. Sub-agencies and master servicers would then remit a percentage of the amount collected from each consumer to UDH, as required by their agreements.

101. UDH also sold debt to Debt Collectors and entered into agreements with some Debt Collectors that required the Debt Collectors to make ongoing payments to UDH.

102. UDH had the authority to repurchase or recall any debts, to terminate its contracts with any sub-agencies, and to stop master servicers from placing any UDH debt with specific Debt Collectors due to compliance concerns, at any time.

**UDH's Relationship with JTM**

103. UDH started placing debt with JTM as a master servicer in 2015.

104. UDH's compliance department periodically requested recorded debt-collection phone calls from most of the Debt Collectors with which UDH placed debt.

105. From 2015 through January 2017, UDH's compliance staff reviewed recorded phone calls from JTM's Debt Collectors and found that many contained major violations of the FDCPA or the CFPA's prohibition against unfair, deceptive, or abusive acts and practices.

106. In 2015 and 2016, UDH received complaints from consumers whose accounts were placed by or with JTM, complaining that they had been threatened with arrest, jail, or a lawsuit if they did not pay.

107. In approximately 2016, UDH's then-compliance manager told Manseth and Turco that UDH should stop using JTM.

108. Instead of terminating JTM, however, UDH, with Manseth's and Turco's knowledge, increased its reliance on JTM to collect its debts.

109. In 2017, UDH placed more than 380,000 accounts with JTM and was using JTM almost exclusively as its master servicer.

110. JTM continued to serve as UDH's master servicer through mid-2018.

**UDH and JTM Transition Their Business Activities to UHG**

111. In May 2017, the Individual Defendants co-founded UHG.

112. UDH and JTM soon began transitioning nearly all aspects of their business to UHG.

113. In May 2017, UDH and UHG signed a written agreement obligating UHG to handle all or almost all of UDH's business affairs in exchange for all or most of the profit derived from UDH's ongoing affairs.

114. In May 2017, JTM and UHG signed a written agreement obligating UHG to handle all or almost all of JTM's business affairs in exchange for all or most of the profit derived from JTM's ongoing affairs.

115. From September 2017 through April of 2020, the Defendants collectively placed more than 6.5 million accounts with a face value of more than $8 billion.

116. Around 2017 and 2018, UDH assigned its then-existing debt portfolios to UHG.

117. By January 2018, then-employees of UDH and JTM became employees of UHG.

118. By January 2018, the office spaces used by UDH and JTM transitioned to become office space for UHG.

119. The work of transitioning all of UDH's business to UHG was handled by UHG employees.

120. The work of maintaining and transitioning JTM's business to UHG was handled by UHG employees.

121. UHG continued to use the same policies and procedures as UDH, often without changing anything but the name of the business entity.

122. UHG continued to use the same technology, the same software systems, and the same vendors pursuant to the same contracts as UDH.

123. UHG continued to use JTM's and UDH's portfolios, consumer data, account details, and performance statistics to obtain new financing and business, and to collect on existing portfolios.

124. UHG continued to use the same complaints-management system as JTM and UDH.

125. For all intents and purposes, UDH, JTM, and UHG have operated as a single entity under the control of the Individual Defendants since at least mid-2017.

126. This operating entity frequently held and continues to hold itself out as "United Holding Group," which is the name that it uses on its letterhead for corporate and consumer correspondence, internal documents, forms, policies and procedures, documents it provides in support of its contracts with lenders and other debt collectors, and its public-facing website (www.uhgllc.com), which bears the name and logo "United Holding Group" in large letters at the top and refers to the company as "United Holding Group" throughout.

**Defendants' Relationships with Placement Debt Collectors**

127. UDH, JTM, and UHG, at the direction of the Individual Defendants, contracted with Debt Collectors to collect debt on behalf of UDH, JTM, and UHG, either directly or through another Debt Collector.

128. UDH, JTM, and UHG provided the Debt Collectors collecting on their behalf with consumers' contact information, personal identifying information, and account details related to the debt the consumers allegedly owed.

129. UDH, JTM, and UHG authorized the Debt Collectors to contact the

consumers directly.

130. The Debt Collectors used information provided by UDH, JTM, and UHG to collect directly from consumers.

131. In some instances, the Debt Collectors told consumers they were collecting on behalf of UDH, JTM, or UHG.

132. In some instances, when UDH, JTM, or UHG spoke directly to the consumers, they directed consumers back to the Debt Collectors to work out the details of debt payment or to verify the debt.

133. The Debt Collectors remitted a percentage of the amount collected from each consumer to UDH, JTM, and UHG, pursuant to their agreements.

134. From at least 2015 to the present, UDH, JTM, or UHG, as well as the Individual Defendants, exercised control over the Debt Collectors collecting on the debt placed by Defendants.

135. UDH, JTM, and UHG provided written guidance to the Debt Collectors which, on paper at least, required certain conduct standards, audits, testing, and training of staff.

136. UDH, JTM, and UHG, as well as the Individual Defendants, also had the authority to instruct Debt Collectors about how to handle consumer complaints, whether to discipline collection employees, and how to change collection behavior.

137. UDH, JTM, and UHG, as well as the Individual Defendants, had the

authority to remove accounts from Debt Collectors and to refuse to send additional accounts to Debt Collectors.

**False Threats of Lawsuits**

138. From at least 2015 through mid-2018, UDH placed debt directly or through JTM or another master servicer with Debt Collectors that made implied and express misrepresentations that, if consumers did not settle their debts now, they would be sued.

139. During calls with consumers, some of the Debt Collectors made express and implied representations that their contact with consumers represented a final step before “the client” would file suit, or otherwise indicated that their contact with consumers represented a final step before suit. Some of these Debt Collectors told consumers their status or account was pre-legal, in mediation, or in arbitration as part of that representation.

140. At least one of these Debt Collectors repeatedly and falsely threatened that consumers were going to be served with legal papers imminently at home or at work.

141. From at least 2015 to at least 2019, JTM continued to place debt with and sell debt to some of the same Debt Collectors referenced in Paragraphs 138-140 as well as other Debt Collectors that made express and implied representations that their contact with consumers represented a final step before “the client” would

file suit, or otherwise indicated that their contact with consumers represented a final step before suit. Some of these Debt Collectors told consumers their status or account was pre-legal, in mediation, or in arbitration as part of that representation.

142. From at least 2018 to at least March 2020, UHG placed debt with and sold debt to some of the same Debt Collectors referenced in Paragraphs 138-140 as well as other Debt Collectors that made express and implied representations that their contact with consumers represented a final step before "the client" would file suit, or otherwise indicated that their contact with consumers represented a final step before suit. Some of these Debt Collectors told consumers their status or account was pre-legal, in mediation, or in arbitration.

143. For example, a Debt Collector referenced in Paragraphs 138, 139, 141, and 142 made the following statements to consumers:

a. "The problem is in order to secure this claim, you have to have something down to validate payment information for this month before the filing date and the filing date would be at the end of the month. They're seeking restitution for $750.94. In order to really get it where they would not pull this and file against you, to have an arrangement set on file and that would basically mean you would definitely need to have something down . . . so that has to be electronically attached by our clients attorneys they have that in

order to secure past the date that it is scheduled to file out."

b. "I'm the one who is assigned to this case, in accordance with Texas state law you do have the right to be notified prior to any action or judgment being filed against you ah in state supreme court. So we have been retained concerning a breach of contract. We handle mediation ah for a group of investing attorneys . . ."

144. None of the Debt Collectors referenced above were authorized by UDH, JTM, or UHG to sue consumers.

145. None of the Debt Collectors referenced above sued consumers on debts they were collecting for UDH, JTM, or UHG.

146. UDH, JTM, and UHG had no imminent plan to sue the consumers threatened by the Debt Collectors when these statements were made.

**False Statements about Credit Reporting**

147. Some of the Debt Collectors with which UDH, JTM, or UHG placed debt, or their downstream Debt Collectors, made representations that consumers' credit scores or credit histories would be impacted positively if they paid the debt or, conversely, would be impacted negatively if they did not pay the debt.

148. UDH, JTM, and UHG did not furnish information to credit-reporting agencies regarding these debts.

149. None of the Debt Collectors making those statements furnished

information to credit-reporting agencies regarding these debts.

**False Threats of Arrest or Jail**

150. Since 2015, Defendants have received complaints from more than 500 consumers that Debt Collectors collecting on debt placed by Defendants or sold by Defendants have made express or implied misrepresentations that consumers would be arrested, jailed, or face criminal charges if they did not pay their debts.

151. For example, consumers made the following complaints about agents who were collecting on debt that was sold by UDH or placed for collection by UDH:

a. Agents were "harassing me," a collector "came to my work," and was "making threats to take me to court, jail, harassing family, and now coming to my work."

b. A collector "threatened me with arrest if I didn't pay $500. I didn't have the money as I'm on social security. I went and got a car title loan of $400 to send the money to avoid jail."

c. My "HS-age daughter's rcvd threatening calls @ her school saying 'your mommy's going to be in jail, you can visit your mother in jail.'"

d. A collector "is threatening to send me to jail, prosecute me, even going as far as bodily harm. I will be filing a complaint with my

local police department, because they have me too afraid to leave my house! I am disabled, and suffer from heart issues."

e. A collector repeatedly called a consumer at work demanding payment on a loan that did not belong to her, and "[i]f I refuse they will have police arrest me... [They] have repeat[ed]ly called my job with threats and cursing me when I refuse to give them my card info. My employer is threaten[ing] to relieve me due to constant calling from this company."

152. From at least 2015 to 2017, consumers whose debt was sold by UDH, or placed for collection by UDH, complained that collectors from multiple Debt Collectors used by UDH made implied and express representations that the consumers were imminently going to face criminal charges, be arrested, or face jail time if the consumers could not pay their debts immediately. These representations were false because these were not debts for which nonpayment would result in any of these consequences.

**Defendants' Knowledge of Violations**

153. Since 2015, Defendants have received hundreds of complaints from consumers that Debt Collectors collecting on debt placed by Defendants or sold by Defendants have made express or implied misrepresentations that (a) consumers would face arrest, jail, or lawsuits imminently if they did not pay their debts, or (b)

consumers' credit reports would improve if they paid their debts or would be affected negatively if they did not pay their debts.

154. Many of the complaints were forwarded to Defendants from the creditors that originally sold the debt portfolios.

155. When Defendants received these complaints, they often forwarded them to the Debt Collector serving as master servicer or to the Debt Collectors referenced in the complaints.

156. Defendants also received recorded collection calls with consumers from placement Debt Collectors in which the Debt Collectors were falsely threatening lawsuits and making false statements about credit reporting.

157. Because of their roles managing UDH, JTM, or UHG, including roles in compliance and resolving escalated consumer complaints, Manseth, Turco, and Adamo knew or should have known about the false threats of litigation and false statements about credit reporting made by the Debt Collectors referenced in Paragraphs 138-142 and 147-149.

158. Yet Defendants continued placing debt with and, in some instances, selling debt to the Debt Collectors referenced in Paragraphs 138-142 and 147-149 after receiving evidence of the violations.

159. UDH, JTM, and UHG did not take meaningful action to prevent or preclude further false statements, and the Defendants for the most part continued

doing business as usual with these Debt Collectors.

160. Because of his role managing UDH, including his involvement in resolving escalated consumer complaints, Manseth knew or should have known about the false arrest or jail threats made by the Debt Collectors referenced in Paragraphs 150 and 152.

161. UDH took no meaningful action to prevent or preclude false statements by Debt Collectors and for the most part, UDH and Manseth continued to do business as usual with Debt Collectors after consumers complained about jail threats.

162. Defendants continued to allow the Debt Collectors referenced in Paragraphs 138-142, 147-149, 150, and 152 to collect from thousands of consumers on debt that had been placed or sold by Defendants and continued to benefit financially by seeking and accepting payments from these Debt Collectors for years after receiving evidence of the violations.

163. Several of the Debt Collectors that collected debt on behalf of Defendants or that the Defendants sold debt to were sued by state and federal regulators between 2015 and 2017 for deceiving consumers, including by making false threats of arrest, criminal prosecution, and lawsuits to collect debt from consumers.

164. On several occasions, when original creditors received complaints or

contacted Defendants to check on Debt Collectors' compliance with debt-collection laws, one or more of the Defendants concealed violations, including by telling their Debt Collectors to supply only legally-compliant calls for audits and declining to give original creditors call notes or phone call recordings in Defendants' possession.

165. Defendants have claimed at various times that they terminated relationships with Debt Collectors that have been subject of multiple complaints.

166. Yet Defendants' internal records indicate that Defendants knew or should have known that thousands of debts they owned were still being placed with and sold to the Debt Collectors they claimed to have terminated.

167. In some instances, the Debt Collectors changed their names and continued collecting debts on Defendants' behalf. In other instances, Defendants knew or should have known that their master servicers passed debt to Debt Collectors referenced in Paragraph 165.

168. In some instances, UDH terminated relationships with Debt Collectors due to compliance concerns but JTM or UHG later began working with those same Debt Collectors.

**COUNT I**

*Against All Defendants*

*CFPA: False Threats of Lawsuits and False Statements About Credit Reporting*

169. The Bureau realleges and incorporates by reference Paragraphs 1–168

of this Complaint.

170. Section 1036(a)(1)(B) of the CFPA prohibits a "covered person" from engaging in deceptive acts or practices. 12 U.S.C. § 5536(a)(1)(B).

171. Defendants represented, expressly or impliedly, through Debt Collectors with which Defendants placed debt and their downstream Debt Collectors, that consumers would be sued if they did not settle their debts now or that repaying (or not repaying) the debt would affect their credit score.

172. In fact, Defendants had not authorized these Debt Collectors to sue consumers about these debts, and Defendants did not intend to sue these consumers imminently. Further, UDH, JTM, UHG, the Debt Collectors did not furnish information on the debts to consumer-reporting agencies.

173. Misrepresentations about impending lawsuits or the effect of payment (or nonpayment) on a consumer's credit score are material to a consumer's decision about when or if to pay a debt and are likely to mislead a consumer acting reasonably under the circumstances.

174. Defendants controlled, directed, and benefitted from the debt-collection conduct of these Debt Collectors.

175. Defendants, acting through Debt Collectors with which they had placed consumer debt and their downstream Debt Collectors, have violated 12 U.S.C. § 5536(a)(1)(B).

## COUNT II

*Against All Defendants*

*Substantially Assisting Violations of the CFPA: Placement and Sale of Debt with Debt Collectors That Made False Threats of Lawsuits and False Statements about Credit Reporting*

176. The Bureau realleges and incorporates by reference Paragraphs 1-168 of this Complaint.

177. Debt Collectors with which UDH, JTM, or UHG directly or indirectly placed debt, Debt Collectors to which UDH, JTM, or UHG sold debt, and downstream Debt Collectors are "covered persons" engaged "in offering or providing a consumer financial product or service" because they collected debt related to extensions of credit. 12 U.S.C. § 5481(6), (15)(A)(x).

178. Debt Collectors with which UDH, UHG, or JTM directly or indirectly placed debt, Debt Collectors to which UDH, UHG, or JTM sold debt, and downstream Debt Collectors engaged in deceptive acts and practices by falsely threatening consumers with impending lawsuits or falsely telling consumers that repaying (or not repaying) the debt would affect their credit score.

179. Misrepresentations about impending lawsuits or the effect of payment (or nonpayment) on a consumer's credit score are material and are likely to mislead a consumer acting reasonably under the circumstances.

180. Debt Collectors engaged in deceptive acts or practices that violate 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

181. The Individual Defendants, acting through UDH, JTM, and UHG, at times directly participated in placing or selling portfolios and had the authority to control placements or sales.

182. The Individual Defendants, acting through UDH, JTM, and UHG, used Debt Collectors to collect on their debt despite these Debt Collectors' continued deceptive statements to consumers.

183. Each of the Individual Defendants actively managed the day-to-day operation of UDH, JTM, or UHG, and handled escalated compliance issues and escalated consumer complaints for at least one of the corporate Defendants.

184. Because the Defendants knew or should have known of the deceptive acts and practices of the Debt Collectors and continued to place or permit placement of debt directly or indirectly with them or continued to sell or permit sales of portfolios to them, they knowingly or recklessly substantially assisted these Debt Collectors' conduct and have violated the CFPA, 12 U.S.C. § 5536(a)(3).

**COUNT III**

*Against UDH and Manseth*

*Substantially Assisting Violations of the CFPA: Placement and Sale of Debt to Debt Collectors and Buyers That Made False Threats of Arrest*

185. The Bureau realleges and incorporates by reference Paragraphs 1–168 of this Complaint.

186. From at least 2015 to 2017, UDH directly or indirectly placed debt

with and sold debt to Debt Collectors that committed deceptive acts or practices by falsely threatening consumers with criminal charges, arrest, or jail time.

187. These Debt Collectors' deceptive acts or practices violated 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

188. Manseth directly participated in placing and selling debt portfolios and handling escalated compliance issues and escalated consumer complaints for UDH.

189. Because Manseth and UDH knew or should have known that Debt Collectors were engaging in deceptive acts and practices by making false threats of criminal charges, arrest, or jail time and continued to place or permit placement of debt directly or indirectly with them or continued to sell or permit sales of portfolios to them, Manseth and UDH knowingly or recklessly substantially assisted the Debt Collectors' conduct, and have violated the CFPA, 12 U.S.C. § 5536(a)(3).

**COUNT IV**
*Against JTM and UHG*
*FDCPA: False Threats of Lawsuits and False Statements About Credit Reporting*

190. The Bureau realleges and incorporates by reference Paragraphs 1–168 of this Complaint.

191. JTM and UHG are each "debt collectors" under the FDCPA. 15 U.S.C. § 1692a(6).

192. Section 807 of the FDCPA, 15 U.S.C. § 1692e, prohibits debt collectors from using any false, deceptive, or misleading representation or means in connection with the collection of any debt.

193. Section 807(5) of the FDCPA, 15 U.S.C. § 1692e (5), specifically prohibits debt collectors from making threats to take any action that cannot legally be taken or that is not intended to be taken.

194. Section 807(10) of the FDCPA, 15 U.S.C. § 1692e(10), specifically prohibits debt collectors from using false representations or deceptive means to collect or attempt to collect any debt.

195. Section 807(13) of the FDCPA, 15 U.S.C. § 1692e(13) prohibits debt collectors from falsely representing or implying that documents are legal process.

196. In collecting and attempting to collect debts from consumers, JTM and UHG represented expressly or impliedly, through placement Debt Collectors or their downstream Debt Collectors, that consumers would be sued if they did not settle their debts now or that consumers' credit scores would be affected by the payment (or nonpayment) of the debt.

197. In fact, JTM and UHG had not authorized these Debt Collectors to sue consumers about these debts, and JTM and UHG did not intend to sue these consumers imminently. Further, JTM, UHG, and the Debt Collectors did not furnish information on the debts to consumer-reporting agencies.

198. These representations were false and misleading and constitute deceptive practices under § 807 of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(5), 1692e(10), 1692e(13).

**COUNT V**
*Against JTM and UHG*
*Violations of the CFPA Arising from FDCPA Violations*

199. The Bureau realleges and incorporates by reference Paragraphs 1–168 of this Complaint.

200. Section 1036(a)(1)(A) of the CFPA provides that it is "unlawful for . . . any covered person or service provider . . . to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law." 12 U.S.C. § 5536(a)(1)(A).

201. Because JTM and UHG are "covered persons" who violated the FDCPA, they also violated § 1036(a)(1)(A) of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

**DEMAND FOR RELIEF**

202. Wherefore, the Bureau, pursuant to §§ 1054 and 1055 of the CFPA, 12 U.S.C. §§ 5564 and 5565, and the Court's own equitable powers, requests that the Court:

a. permanently enjoin Defendants from committing future violations of the CFPA, the FDCPA, or any other provision of "Federal consumer financial law," as defined by 12 U.S.C. § 5481(14);

b. grant additional injunctive relief as the Court may deem to be just and proper;

c. award damages and other monetary relief against Defendants as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the CFPA and the FDCPA, including but not limited to rescission or reformation of contracts, restitution, and the refund of monies paid;

d. order disgorgement of Defendants' ill-gotten gains;

e. award civil money penalties;

f. award the costs of bringing this action; and

g. award additional relief as the Court may determine to be just and proper.

Dated: February 23, 2022

Respectfully submitted,

Eric Halperin
*Enforcement Director*
Richa S. Dasgupta
*Deputy Enforcement Director*
James T. Sugarman
*Assistant Litigation Deputy*

/s/ Lindsay Castanien
Lindsay Castanien
Vanessa Buchko
Stephanie Brenowitz
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone (Castanien): 202-435-9372
Telephone (Buchko): 202-435-9593
Telephone (Brenowitz): 202-435-9005
Fax: 202-435-7722
E-mail: Lindsay.Castanien@cfpb.gov
E-mail: Vanessa.Buchko@cfpb.gov
E-mail: Stephanie.Brenowitz@cfpb.gov
*Attorneys for Consumer Financial Protection Bureau*

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Consumer Financial Protection Bureau,<br><br>Plaintiff,<br><br>v.<br><br>Craig Manseth, Jacob Adamo, Darren Turco, United Debt Holding LLC, JTM Capital Management, LLC, ~~and United Holding Group~~UHG, LLC~~.~~, UHG I LLC (also known as United Holding Group), and UHG II LLC (collectively holding themselves out as United Holding Group, United Holding Group, LLC, and United Holdings Group, LLC~~, UHG, LLC, UHG I LLC, and UHG II LLC,~~)<br><br>Defendants. | Case No. 1:22-cv-29<br><br>**AMENDED COMPLAINT** |

The Consumer Financial Protection Bureau (Bureau) brings this action against Defendants Craig Manseth~~,~~; Jacob Adamo~~,~~; Darren Turco~~,~~; United Debt Holding LLC (UDH~~),~~); JTM Capital Management, LLC (JTM~~),~~); and UHG, LLC, UHG I LLC (doing business as United Holding Group~~, LLC (also known~~), and UHG II LLC, collectively holding themselves out as United Holding Group, United Holding Group, LLC, and United Holdings Group, LLC, ~~UHG, LLC, UHG~~

I LLC, and UHG II LLC) (and referred to herein collectively as "UHG)," and alleges as follows:

**INTRODUCTION**

1. UDH, JTM, and UHG are debt collectors that have purchased defaulted consumer debt worth tens of millions of dollars. They place the debt portfolios they purchase with, or sell them to, other debt collection companies.

2. Since at least 2014, UDH, JTM, and UHG have knowingly or recklessly placed and sold debts to debt collection agencies that used threats and misrepresentations to coerce payments from consumers.

3. Craig Manseth, Darren Turco, and Jacob Adamo (collectively "Individual Defendants") directed or controlled the unlawful conduct of UDH, JTM, and UHG and also participated directly in the unlawful conduct of UDH, JTM, and UHG.

4. Manseth owned and managed UDH, a debt buyer in Colorado.

5. Turco was Executive Vice President for UDH, reporting to Manseth.

6. Adamo owned and managed JTM, a debt buyer based in this district.

7. The Individual Defendants joined forces to create and operate UHG, a debt buyer based in this district. UHG then took over the ongoing business of UDH and JTM.

8. The Defendants knew or should have known the debt collection agencies with which they placed and sold debt were making false threats and false statements to consumers. But, despite that knowledge, they continued to place and sell debts to them.

9. Defendants' illegal practices violated the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531(a), 5536(a)(1), 5536(a)(3).

10. Defendants UHG and JTM's practices also violated the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692-1692p.

**JURISDICTION AND VENUE**

11. This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

12. Venue is proper in this district because Defendants do business here. 12 U.S.C. § 5564(f).

**PARTIES**

13. The Bureau is an independent agency of the United States charged with regulating the offering and provision of consumer-financial products and services under Federal consumer financial laws. 12 U.S.C. § 5491(a). The Bureau

has independent litigating authority to enforce Federal consumer financial laws, including the CFPA and the FDCPA. 12 U.S.C. §§ 5564(a)-(b); 5481(12), (14).

**UDH**

14. UDH is a Delaware limited-liability company with its principal place of business at 383 Inverness Parkway, Suite 280, Englewood, Colorado.

15. The principal purpose of UDH's business was collecting on debt.

16. UDH purchased portfolios of defaulted consumer debt worth millions of dollars for a small fraction of their outstanding balance. UDH then placed the portfolios with or sold them to other debt-collection companies, and some of those debt-collection companies in turn placed or sold the portfolios to downstream debt collection companies and on down the line (collectively, "Debt Collectors").

17. The Debt Collectors that UDH placed debt with collected the defaulted consumer debts on UDH's behalf.

18. Most of the debts UDH purchased, collected on, and sold were primarily for use by consumers for personal, family, or household purposes.

19. Many of the debts UDH purchased, collected on, and sold were for extensions of credit, such as payday loans, sub-prime credit cards, online installment loans, and auto loans.

20. From at least 2014 through at least mid-2018, UDH engaged in the business of debt collection in this district.

21. UDH entered agreements for the provision of debt-collection services that occurred at least in part in this district.

22. Debt Collectors located in this district collected debt from consumers on behalf of UDH.

23. UDH has also engaged in the business of debt collection throughout the United States.

24. The activities described in Paragraphs 14 through 23, above, are "consumer financial products or services" under the CFPA, 12 U.S.C. § 5481(5), (15)(A)(i), (15)(A)(x)

25. UDH is a "covered person" under the CFPA. 12 U.S.C. § 5481(6).

**JTM**

26. JTM is a Delaware limited-liability company with its principal place of business in this district at 6400 Sheridan Drive, Suite 138, Williamsville, New York.

27. The principal purpose of JTM's business is collecting on debt.

28. The majority of JTM's revenue was from debt collection.

29. JTM purchased portfolios of defaulted consumer debt worth millions of dollars for a small fraction of their outstanding balance and then placed the

portfolios with or sold them to other Debt Collectors. Some of those Debt Collectors in turn placed or sold the portfolios to downstream Debt Collectors.

30. The companies that JTM placed debt with collected the defaulted consumer debts on JTM's behalf.

31. Most of the debts JTM purchased, collected on, and sold were primarily for use by consumers for personal, family, or household purposes.

32. Many of the debts JTM purchased, collected on, and sold were for extensions of credit, such as payday loans, sub-prime credit cards, online installment loans, and auto loans.

33. From at least 2015 to at least 2019, JTM engaged in the business of debt collection in this district.

34. JTM entered agreements in this district for the provision of debt-collection services that occurred at least in part in this district.

35. Debt Collectors located in this district collected debt from consumers on behalf of JTM.

36. JTM also engaged in the business of debt collection throughout the United States.

37. The activities described in Paragraphs 26 through 36, above, are "consumer financial products or services" under the CFPA, 12 U.S.C. § 5481(5), (15)(A)(i), (15)(A)(x).

38. JTM is a "covered person" under the CFPA. 12 U.S.C. § 5481(6).

**UHG**

39. UHG, LLC is a Delaware limited-liability company with its principal place of business in this district at 6400 Sheridan Drive, Suite 138, Williamsville, New York.

40. UHG I LLC is a Delaware limited-liability company with its principal place of business at 6400 Sheridan Drive, Williamsville, New York, and does business under the assumed name of "United Holding Group."

41. UHG II LLC is a Delaware limited-liability company with its principal place of business at 6400 Sheridan Drive, Williamsville, New York.

42. At all times relevant, UHG, LLC, UHG I LLC, and UHG II LLC have done business, and continue to do business, under the names "United Holding Group," "United Holding Group, LLC," and "United Holdings Group, LLC."

~~40.~~43. The principal purpose of UHG's business is collecting on debt.

~~41.~~44. The majority of UHG's revenue was from debt collection.

~~42.~~45. UHG bought portfolios of defaulted consumer debt worth millions of dollars for a small fraction of their outstanding balance and then placed the

portfolios with or sold them to other Debt Collectors. Some of those Debt Collectors in turn placed or sold the portfolios to downstream Debt Collectors.

~~43.~~46. The Debt Collectors that UHG placed debt with collected the defaulted consumer debts on UHG's behalf.

~~44.~~47. Most of the debts UHG purchased, collected on, and sold were primarily for use by consumers for personal, family, or household purposes.

~~45.~~48. Many of the debts UHG purchased, collected on, and sold were for extensions of credit, such as payday loans, sub-prime credit cards, online installment loans, and auto loans.

~~46.~~49. From at least 2017 to the present, UHG engaged in the business of debt collection in this district.

~~47.~~50. UHG entered agreements in this district for the provision of debt-collection services that occurred at least in part in this district.

~~48.~~51. Debt Collectors located in this district collected debt from consumers on behalf of UHG.

~~49.~~52. UHG also engaged in the business of debt collection throughout the United States.

~~50.~~53. The activities described in Paragraphs 39 through ~~49~~52, above, are "consumer financial products or services" under the CFPA, 12 U.S.C. § 5481(5), 15(A)(i), 15(A)(x).

~~51.~~54. UHG is a "covered person" under the CFPA. 12 U.S.C. § 5481(6).

**Manseth**

~~52.~~55. Craig Manseth resides in Parker, Colorado.

~~53.~~56. In 2008, Manseth founded UDH, which he owned and operated.

~~54.~~57. At all relevant times, Manseth has served as Chief Executive Officer and President of UDH.

~~55.~~58. From at least 2014, and at all relevant times, Manseth had managerial responsibility for UDH and materially participated in UDH's affairs.

~~56.~~59. Manseth determined which debt portfolios UDH purchased, which Debt Collectors bought debt from UDH or collected on debt for UDH, and which Debt Collectors were terminated.

~~57.~~60. Manseth negotiated the terms and prices for UDH's purchase and collections agreements and communicated with Debt Collectors and original creditors about consumer complaints, which included handling escalated complaints.

~~58.~~61. Manseth developed UDH's business strategies and practices and oversaw UDH's workforce.

~~59.~~62. Due to the size and structure of UDH and Manseth's roles in operating the company, Manseth knew or should have known that UDH was engaging in the violations described herein.

~~60.~~63. Manseth is also a founder, Co-Chief Executive Officer, and Chief Financial Officer of UHG.

~~61.~~64. Since 2017, Manseth has had managerial responsibility for UHG and has materially participated in its affairs.

~~62.~~65. Manseth, along with Turco and Adamo, determined which debt portfolios UHG purchased.

~~63.~~66. Manseth determined which Debt Collectors bought debt from UHG.

~~64.~~67. Manseth negotiated financing for UHG and signed binding documents on behalf of UHG.

~~65.~~68. Manseth, along with Turco and Adamo, developed UHG's business strategies and practices and oversaw UHG's workforce.

~~66.~~69. Due to the size and structure of UHG and Manseth's roles in operating the company, Manseth knew or should have known that UHG was engaging in the violations described herein.

~~67.~~70. Manseth is a "related person" under the CFPA. 12 U.S.C. § 5481(25)(C)(i), (ii). Because Manseth is a "related person," he is deemed a "covered person" for purposes of the CFPA. 12 U.S.C. § 5481(25)(B).

~~68.~~71. Through UDH and UHG, Manseth has conducted business in this district from at least 2014 to the present.

**Adamo**

~~69.~~72. Adamo resided in this district, in Pendleton, New York at all times relevant to this complaint.

~~70.~~73. Adamo is the founder and an operator and owner of JTM.

~~71.~~74. Since at least 2014, Adamo has had managerial responsibility for JTM and has materially participated in its affairs.

~~72.~~75. Adamo:

a. developed JTM's business strategies and practices;

b. monitored Debt Collectors' activities and compliance, which included handling escalated complaints; and

c. oversaw JTM's workforce.

~~73.~~76. Due to the size and structure of JTM and Adamo's roles in operating the company, he knew or should have known that JTM was engaging in the violations described herein.

~~74.~~77. Adamo is also a founder, Co-Chief Executive Officer, and Chief Operations Officer of UHG.

~~75.~~78. Since 2017, Adamo has had managerial responsibility for UHG and has materially participated in its affairs.

~~76.~~79. Adamo, along with Manseth and Turco, determined which debt portfolios UHG purchased.

~~77.~~80. Adamo determined which Debt Collectors collected on debt for UHG

and which Debt Collectors were terminated.

~~78.~~81. Adamo, along with Turco, monitored Debt Collectors' activities and compliance, which included handling escalated complaints, on behalf of UHG.

~~79.~~82. Adamo, along with Manseth and Turco, developed UHG's business strategies and practices and oversaw UHG's workforce.

~~80.~~83. Due to the size and structure of UHG and Adamo's roles in operating the company, Adamo knew or should have known that UHG was engaging in the violations described herein.

~~81.~~84. Adamo is a "related person" under the CFPA. 12 U.S.C. 5481(25)(C)(i), (ii). Because Adamo is a "related person," he is deemed a "covered person" for purposes of the CFPA. 12 U.S.C. 5481(25)(B).

~~82.~~85. Through JTM and UHG, Adamo has conducted business in this district from at least 2014 to the present.

**Turco**

~~83.~~86. Darren Turco resides in Parker, Colorado.

~~84.~~87. Prior to 2017, Turco was employed by UDH as its Executive Vice President, where he reported to Manseth and assisted with managing compliance issues relating to Debt Collectors.

~~85.~~88. Turco is a founder and Co-Chief Executive Officer of UHG.

~~86.~~89. Since 2017, Turco has had managerial responsibility for UHG and has

materially participated in its affairs.

~~87.~~90. Turco, along with Manseth and Adamo, determined which debt portfolios UHG purchased.

~~88.~~91. Turco, along with Adamo, monitored Debt Collectors' activities and compliance, which included handling escalated complaints, on behalf of UHG.

~~89.~~92. Turco communicated with original creditors on behalf of UHG about consumer complaints.

~~90.~~93. Turco, along with Manseth and Adamo, developed UHG's business strategies and practices and oversaw UHG's workforce.

~~91.~~94. Due to the size and structure of UHG and Turco's roles in the company, Turco knew or should have known that UHG was engaging in the violations described herein.

~~92.~~95. Turco is a "related person" under the CFPA. 12 U.S.C. 5481(25)(C)(i), (ii). Because Turco is a "related person," he is deemed a "covered person" for purposes of the CFPA. 12 U.S.C. 5481(25)(B).

~~93.~~96. Through UHG, Turco has conducted business in this district from at least 2017 to the present.

## FACTS

### Background on UDH

~~94.~~97. From its inception, Manseth used UDH to purchase millions of dollars

in defaulted consumer debt for pennies on the dollar.

~~95.~~98. Beginning in or before 2014, UDH's primary lines of business were placing consumer debt with and selling consumer debt to other Debt Collectors.

~~96.~~99. In some situations, UDH placed its debt with Debt Collectors called "master servicers," who then placed it with other Debt Collectors that collected the debts on UDH's behalf and with UDH's knowledge.

~~97.~~100. Sub-agencies and master servicers would then remit a percentage of the amount collected from each consumer to UDH, as required by their agreements.

~~98.~~101. UDH also sold debt to Debt Collectors and entered into agreements with some Debt Collectors that required the Debt Collectors to make ongoing payments to UDH.

~~99.~~102. UDH had the authority to repurchase or recall any debts, to terminate its contracts with any sub-agencies, and to stop master servicers from placing any UDH debt with specific Debt Collectors due to compliance concerns, at any time.

**UDH's Relationship with JTM**

~~100.~~103. UDH started placing debt with JTM as a master servicer in 2015.

~~101.~~104. UDH's compliance department periodically requested recorded

debt-collection phone calls from most of the Debt Collectors with which UDH placed debt.

~~102.~~105. From 2015 through January 2017, UDH's compliance staff reviewed recorded phone calls from JTM's Debt Collectors and found that many contained major violations of the FDCPA or the CFPA's prohibition against unfair, deceptive, or abusive acts and practices.

~~103.~~106. In 2015 and 2016, UDH received complaints from consumers whose accounts were placed by or with JTM, complaining that they had been threatened with arrest, jail, or a lawsuit if they did not pay.

~~104.~~107. In approximately 2016, UDH's then-compliance manager told Manseth and Turco that UDH should stop using JTM.

~~105.~~108. Instead of terminating JTM, however, UDH, with Manseth's and Turco's knowledge, increased its reliance on JTM to collect its debts.

~~106.~~109. In 2017, UDH placed more than 380,000 accounts with JTM and was using JTM almost exclusively as its master servicer.

~~107.~~110. JTM continued to serve as UDH's master servicer through mid-2018.

**UDH and JTM Transition Their Business Activities to UHG**

~~108.~~111. In May 2017, the Individual Defendants co-founded UHG.

~~109.~~112. UDH and JTM soon began transitioning nearly all aspects of

their business to UHG.

~~110.~~113. In May 2017, UDH and UHG signed a written agreement obligating UHG to handle all or almost all of UDH's business affairs in exchange for all or most of the profit derived from UDH's ongoing affairs.

~~111.~~114. In May 2017, JTM and UHG signed a written agreement obligating UHG to handle all or almost all of JTM's business affairs in exchange for all or most of the profit derived from JTM's ongoing affairs.

~~112.~~115. From September 2017 through April of 2020, the Defendants collectively placed more than 6.5 million accounts with a face value of more than $8 billion.

~~113.~~116. Around 2017 and 2018, UDH assigned its then-existing debt portfolios to UHG.

~~114.~~117. By January 2018, then-employees of UDH and JTM became employees of UHG.

~~115.~~118. By January 2018, the office spaces used by UDH and JTM transitioned to become office space for UHG.

~~116.~~119. The work of transitioning all of UDH's business to UHG was handled by UHG employees.

~~117.~~120. The work of maintaining and transitioning JTM's business to UHG was handled by UHG employees.

~~118.~~121. UHG continued to use the same policies and procedures as UDH, often without changing anything but the name of the business entity.

~~119.~~122. UHG continued to use the same technology, the same software systems, and the same vendors pursuant to the same contracts as UDH.

~~120.~~123. UHG continued to use JTM's and UDH's portfolios, consumer data, account details, and performance statistics to obtain new financing and business, and to collect on existing portfolios.

~~121.~~124. UHG continued to use the same complaints-management system as JTM and UDH.

~~122.~~125. For all intents and purposes, UDH, JTM, and UHG have operated as a single entity under the control of the Individual Defendants since at least mid-2017.

~~123. But Defendants have misrepresented the connections and ongoing nature of their various business entities. For example, a Colorado state agency found that Turco submitted a false affidavit when applying for UHG's collection agency license by omitting any reference to his prior work with UDH. Colorado had previously taken action against UDH, alleging that certain of its Debt Collectors had made false threats of lawsuits and false threats of arrest or criminal proceedings, among other violations.~~

126. This operating entity frequently held and continues to hold itself out as "United Holding Group," which is the name that it uses on its letterhead for corporate and consumer correspondence, internal documents, forms, policies and procedures, documents it provides in support of its contracts with lenders and other debt collectors, and its public-facing website (www.uhgllc.com), which bears the name and logo "United Holding Group" in large letters at the top and refers to the company as "United Holding Group" throughout.

**Defendants' Relationships with Placement Debt Collectors**

~~124.~~127. UDH, JTM, and UHG, at the direction of the Individual Defendants, contracted with Debt Collectors to collect debt on behalf of UDH, JTM, and UHG, either directly or through another Debt Collector.

~~125.~~128. UDH, JTM, and UHG provided the Debt Collectors collecting on their behalf with consumers' contact information, personal identifying information, and account details related to the debt the consumers allegedly owed.

~~126.~~129. UDH, JTM, and UHG authorized the Debt Collectors to contact the consumers directly.

~~127.~~130. The Debt Collectors used information provided by UDH, JTM, and UHG to collect directly from consumers.

~~128.~~131. In some instances, the Debt Collectors told consumers they were collecting on behalf of UDH, JTM, or UHG.

~~129.~~132. In some instances, when UDH, JTM, or UHG spoke directly to the consumers, they directed consumers back to the Debt Collectors to work out the details of debt payment or to verify the debt.

~~130.~~133. The Debt Collectors remitted a percentage of the amount collected from each consumer to UDH, JTM, and UHG, pursuant to their agreements.

~~131.~~134. From at least 2015 to the present, UDH, JTM, or UHG, as well as the Individual Defendants, exercised control over the Debt Collectors collecting on the debt placed by Defendants.

~~132.~~135. UDH, JTM, and UHG provided written guidance to the Debt Collectors which, on paper at least, required certain conduct standards, audits, testing, and training of staff.

~~133.~~136. UDH, JTM, and UHG, as well as the Individual Defendants, also had the authority to instruct Debt Collectors about how to handle consumer complaints, whether to discipline collection employees, and how to change collection behavior.

~~134.~~137. UDH, JTM, and UHG, as well as the Individual Defendants, had the authority to remove accounts from Debt Collectors and to refuse to send additional accounts to Debt Collectors.

**False Threats of Lawsuits**

~~135.~~138. From at least 2015 through mid-2018, UDH placed debt directly or through JTM or another master servicer with Debt Collectors that made implied and express misrepresentations that, if consumers did not settle their debts now, they would be sued.

~~136.~~139. During calls with consumers, some of the Debt Collectors made express and implied representations that their contact with consumers represented a final step before "the client" would file suit, or otherwise indicated that their contact with consumers represented a final step before suit. Some of these Debt Collectors told consumers their status or account was pre-legal, in mediation, or in arbitration as part of that representation.

~~137.~~140. At least one of these Debt Collectors repeatedly and falsely threatened that consumers were going to be served with legal papers imminently at home or at work.

~~138.~~141. From at least 2015 to at least 2019, JTM continued to place debt with and sell debt to some of the same Debt Collectors referenced in Paragraphs ~~135-137~~138-140 as well as other Debt Collectors that made express and implied representations that their contact with consumers represented a final step before "the client" would file suit, or otherwise indicated that their contact with consumers represented a final step before suit. Some of these Debt Collectors told consumers their status or account was pre-legal, in mediation, or in arbitration

as part of that representation.

~~139.~~142. From at least 2018 to at least March 2020, UHG placed debt with and sold debt to some of the same Debt Collectors referenced in Paragraphs ~~135-137~~138-140 as well as other Debt Collectors that made express and implied representations that their contact with consumers represented a final step before "the client" would file suit, or otherwise indicated that their contact with consumers represented a final step before suit. Some of these Debt Collectors told consumers their status or account was pre-legal, in mediation, or in arbitration.

~~140.~~143. For example, a Debt Collector referenced in Paragraphs ~~135, 136,~~ 138, 139, 141, and ~~139~~142 made the following statements to consumers:

a. "The problem is in order to secure this claim, you have to have something down to validate payment information for this month before the filing date and the filing date would be at the end of the month. They're seeking restitution for $750.94. In order to really get it where they would not pull this and file against you, to have an arrangement set on file and that would basically mean you would definitely need to have something down . . . so that has to be electronically attached by our clients attorneys they have that in order to secure past the date that it is scheduled to file out."

b. "I'm the one who is assigned to this case, in accordance with Texas

state law you do have the right to be notified prior to any action or judgment being filed against you ah in state supreme court. So we have been retained concerning a breach of contract. We handle mediation ah for a group of investing attorneys . . .”

~~141.~~144. None of the Debt Collectors referenced above were authorized by UDH, JTM, or UHG to sue consumers.

~~142.~~145. None of the Debt Collectors referenced above sued consumers on debts they were collecting for UDH, JTM, or UHG.

~~143.~~146. UDH, JTM, and UHG had no imminent plan to sue the consumers threatened by the Debt Collectors when these statements were made.

**False Statements about Credit Reporting**

~~144.~~147. Some of the Debt Collectors with which UDH, JTM, or UHG placed debt, or their downstream Debt Collectors, made representations that consumers’ credit scores or credit histories would be impacted positively if they paid the debt or, conversely, would be impacted negatively if they did not pay the debt.

~~145.~~148. UDH, JTM, and UHG did not furnish information to credit-reporting agencies regarding these debts.

~~146.~~149. None of the Debt Collectors making those statements furnished information to credit-reporting agencies regarding these debts.

**False Threats of Arrest or Jail**

~~147.~~150. Since 2015, Defendants have received complaints from more than 500 consumers that Debt Collectors collecting on debt placed by Defendants or sold by Defendants have made express or implied misrepresentations that consumers would be arrested, jailed, or face criminal charges if they did not pay their debts.

~~148.~~151. For example, consumers made the following complaints about agents who were collecting on debt that was sold by UDH or placed for collection by UDH:

a. Agents were "harassing me," a collector "came to my work," and was "making threats to take me to court, jail, harassing family, and now coming to my work."

b. A collector "threatened me with arrest if I didn't pay $500. I didn't have the money as I'm on social security. I went and got a car title loan of $400 to send the money to avoid jail."

c. My "HS-age daughter's rcvd threatening calls @ her school saying 'your mommy's going to be in jail, you can visit your mother in jail.'"

d. A collector "is threatening to send me to jail, prosecute me, even going as far as bodily harm. I will be filing a complaint with my

local police department, because they have me too afraid to leave my house! I am disabled, and suffer from heart issues."

e. A collector repeatedly called a consumer at work demanding payment on a loan that did not belong to her, and "[i]f I refuse they will have police arrest me... [They] have repeat[ed]ly called my job with threats and cursing me when I refuse to give them my card info. My employer is threaten[ing] to relieve me due to constant calling from this company."

~~149.~~152. From at least 2015 to 2017, consumers whose debt was sold by UDH, or placed for collection by UDH, complained that collectors from multiple Debt Collectors used by UDH made implied and express representations that the consumers were imminently going to face criminal charges, be arrested, or face jail time if the consumers could not pay their debts immediately. These representations were false because these were not debts for which nonpayment would result in any of these consequences.

**Defendants' Knowledge of Violations**

~~150.~~153. Since 2015, Defendants have received hundreds of complaints from consumers that Debt Collectors collecting on debt placed by Defendants or sold by Defendants have made express or implied misrepresentations that (a) consumers would face arrest, jail, or lawsuits imminently if they did not pay their

debts, or (b) consumers' credit reports would improve if they paid their debts or would be affected negatively if they did not pay their debts.

~~151.~~154. Many of the complaints were forwarded to Defendants from the creditors that originally sold the debt portfolios.

~~152.~~155. When Defendants received these complaints, they often forwarded them to the Debt Collector serving as master servicer or to the Debt Collectors referenced in the complaints.

~~153.~~156. Defendants also received recorded collection calls with consumers from placement Debt Collectors in which the Debt Collectors were falsely threatening lawsuits and making false statements about credit reporting.

~~154.~~157. Because of their roles managing UDH, JTM, or UHG, including roles in compliance and resolving escalated consumer complaints, Manseth, Turco, and Adamo knew or should have known about the false threats of litigation and false statements about credit reporting made by the Debt Collectors referenced in Paragraphs ~~135-139~~138-142 and ~~144-146~~147-149.

~~155.~~158. Yet Defendants continued placing debt with and, in some instances, selling debt to the Debt Collectors referenced in Paragraphs ~~135-139~~138-142 and ~~144-146~~147-149 after receiving evidence of the violations.

~~156.~~159. UDH, JTM, and UHG did not take meaningful action to prevent or preclude further false statements, and the Defendants for the most part continued

doing business as usual with these Debt Collectors.

~~157.~~160. Because of his role managing UDH, including his involvement in resolving escalated consumer complaints, Manseth knew or should have known about the false arrest or jail threats made by the Debt Collectors referenced in Paragraphs ~~147~~150 and ~~149~~152.

~~158.~~161. UDH took no meaningful action to prevent or preclude false statements by Debt Collectors and for the most part, UDH and Manseth continued to do business as usual with Debt Collectors after consumers complained about jail threats.

~~159.~~162. Defendants continued to allow the Debt Collectors referenced in Paragraphs ~~135-139, 144-146~~138-142, 147-149, 150, and ~~149~~152 to collect from thousands of consumers on debt that had been placed or sold by Defendants and continued to benefit financially by seeking and accepting payments from these Debt Collectors for years after receiving evidence of the violations.

~~160.~~163. Several of the Debt Collectors that collected debt on behalf of Defendants or that the Defendants sold debt to were sued by state and federal regulators between 2015 and 2017 for deceiving consumers, including by making false threats of arrest, criminal prosecution, and lawsuits to collect debt from consumers.

~~161.~~164. On several occasions, when original creditors received

complaints or contacted Defendants to check on Debt Collectors' compliance with debt-collection laws, one or more of the Defendants concealed violations, including by telling their Debt Collectors to supply only legally-compliant calls for audits and declining to give original creditors call notes or phone call recordings in Defendants' possession.

~~162.~~165. Defendants have claimed at various times that they terminated relationships with Debt Collectors that have been subject of multiple complaints.

~~163.~~166. Yet Defendants' internal records indicate that Defendants knew or should have known that thousands of debts they owned were still being placed with and sold to the Debt Collectors they claimed to have terminated.

~~164.~~167. In some instances, the Debt Collectors changed their names and continued collecting debts on Defendants' behalf. In other instances, Defendants knew or should have known that their master servicers passed debt to Debt Collectors referenced in Paragraph ~~162~~165.

~~165.~~168. In some instances, UDH terminated relationships with Debt Collectors due to compliance concerns but JTM or UHG later began working with those same Debt Collectors.

**COUNT I**

*Against All Defendants*

*CFPA: False Threats of Lawsuits and False Statements About Credit Reporting*

~~166.~~169. The Bureau realleges and incorporates by reference Paragraphs

1–165168 of this Complaint.

167.170. Section 1036(a)(1)(B) of the CFPA prohibits a "covered person" from engaging in deceptive acts or practices. 12 U.S.C. § 5536(a)(1)(B).

168.171. Defendants represented, expressly or impliedly, through Debt Collectors with which Defendants placed debt and their downstream Debt Collectors, that consumers would be sued if they did not settle their debts now or that repaying (or not repaying) the debt would affect their credit score.

169.172. In fact, Defendants had not authorized these Debt Collectors to sue consumers about these debts, and Defendants did not intend to sue these consumers imminently. Further, UDH, JTM, UHG, the Debt Collectors did not furnish information on the debts to consumer-reporting agencies.

170.173. Misrepresentations about impending lawsuits or the effect of payment (or nonpayment) on a consumer's credit score are material to a consumer's decision about when or if to pay a debt and are likely to mislead a consumer acting reasonably under the circumstances.

171.174. Defendants controlled, directed, and benefitted from the debt-collection conduct of these Debt Collectors.

172.175. Defendants, acting through Debt Collectors with which they had placed consumer debt and their downstream Debt Collectors, have violated 12 U.S.C. § 5536(a)(1)(B).

**COUNT II**
*Against All Defendants*
*Substantially Assisting Violations of the CFPA: Placement and Sale of Debt with Debt Collectors That Made False Threats of Lawsuits and False Statements about Credit Reporting*

~~173.~~176. The Bureau realleges and incorporates by reference Paragraphs 1-~~165~~168 of this Complaint.

~~174.~~177. Debt Collectors with which UDH, JTM, or UHG directly or indirectly placed debt, Debt Collectors to which UDH, JTM, or UHG sold debt, and downstream Debt Collectors are "covered persons" engaged "in offering or providing a consumer financial product or service" because they collected debt related to extensions of credit. 12 U.S.C. § 5481(6), (15)(A)(x).

~~175.~~178. Debt Collectors with which UDH, UHG, or JTM directly or indirectly placed debt, Debt Collectors to which UDH, UHG, or JTM sold debt, and downstream Debt Collectors engaged in deceptive acts and practices by falsely threatening consumers with impending lawsuits or falsely telling consumers that repaying (or not repaying) the debt would affect their credit score.

~~176.~~179. Misrepresentations about impending lawsuits or the effect of payment (or nonpayment) on a consumer's credit score are material and are likely to mislead a consumer acting reasonably under the circumstances.

~~177.~~180. Debt Collectors engaged in deceptive acts or practices that violate 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

~~178.~~181. The Individual Defendants, acting through UDH, JTM, and UHG, at times directly participated in placing or selling portfolios and had the authority to control placements or sales.

~~179.~~182. The Individual Defendants, acting through UDH, JTM, and UHG, used Debt Collectors to collect on their debt despite these Debt Collectors' continued deceptive statements to consumers.

~~180.~~183. Each of the Individual Defendants actively managed the day-to-day operation of UDH, JTM, or UHG, and handled escalated compliance issues and escalated consumer complaints for at least one of the corporate Defendants.

~~181.~~184. Because the Defendants knew or should have known of the deceptive acts and practices of the Debt Collectors and continued to place or permit placement of debt directly or indirectly with them or continued to sell or permit sales of portfolios to them, they knowingly or recklessly substantially assisted these Debt Collectors' conduct and have violated the CFPA, 12 U.S.C. § 5536(a)(3).

**COUNT III**
*Against UDH and Manseth*
*Substantially Assisting Violations of the CFPA: Placement and Sale of Debt to Debt Collectors and Buyers That Made False Threats of Arrest*

~~182.~~185. The Bureau realleges and incorporates by reference Paragraphs 1–~~165~~168 of this Complaint.

~~183.~~186. From at least 2015 to 2017, UDH directly or indirectly placed

debt with and sold debt to Debt Collectors that committed deceptive acts or practices by falsely threatening consumers with criminal charges, arrest, or jail time.

~~184.~~187. These Debt Collectors' deceptive acts or practices violated 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

~~185.~~188. Manseth directly participated in placing and selling debt portfolios and handling escalated compliance issues and escalated consumer complaints for UDH.

~~186.~~189. Because Manseth and UDH knew or should have known that Debt Collectors were engaging in deceptive acts and practices by making false threats of criminal charges, arrest, or jail time and continued to place or permit placement of debt directly or indirectly with them or continued to sell or permit sales of portfolios to them, Manseth and UDH knowingly or recklessly substantially assisted the Debt Collectors' conduct, and have violated the CFPA, 12 U.S.C. § 5536(a)(3).

**COUNT IV**
*Against JTM and UHG*
*FDCPA: False Threats of Lawsuits and False Statements About Credit Reporting*

~~187.~~190. The Bureau realleges and incorporates by reference Paragraphs 1–~~165~~168 of this Complaint.

~~188.~~191. JTM and UHG are each "debt collectors" under the FDCPA. 15

U.S.C. § 1692a(6).

~~189.~~192. Section 807 of the FDCPA, 15 U.S.C. § 1692e, prohibits debt collectors from using any false, deceptive, or misleading representation or means in connection with the collection of any debt.

~~190.~~193. Section 807(5) of the FDCPA, 15 U.S.C. § 1692e (5), specifically prohibits debt collectors from making threats to take any action that cannot legally be taken or that is not intended to be taken.

~~191.~~194. Section 807(10) of the FDCPA, 15 U.S.C. § 1692e(10), specifically prohibits debt collectors from using false representations or deceptive means to collect or attempt to collect any debt.

~~192.~~195. Section 807(13) of the FDCPA, 15 U.S.C. § 1692e(13) prohibits debt collectors from falsely representing or implying that documents are legal process.

~~193.~~196. In collecting and attempting to collect debts from consumers, JTM and UHG represented expressly or impliedly, through placement Debt Collectors or their downstream Debt Collectors, that consumers would be sued if they did not settle their debts now or that consumers' credit scores would be affected by the payment (or nonpayment) of the debt.

~~194.~~197. In fact, JTM and UHG had not authorized these Debt Collectors to sue consumers about these debts, and JTM and UHG did not intend to sue these

consumers imminently. Further, JTM, UHG, and the Debt Collectors did not furnish information on the debts to consumer-reporting agencies.

~~195.~~198. These representations were false and misleading and constitute deceptive practices under § 807 of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(5), 1692e(10), 1692e(13).

**COUNT V**
*Against JTM and UHG*
*Violations of the CFPA Arising from FDCPA Violations*

~~196.~~199. The Bureau realleges and incorporates by reference Paragraphs 1–~~165~~168 of this Complaint.

~~197.~~200. Section 1036(a)(1)(A) of the CFPA provides that it is "unlawful for . . . any covered person or service provider . . . to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law." 12 U.S.C. § 5536(a)(1)(A).

~~198.~~201. Because JTM and UHG are "covered persons" who violated the FDCPA, they also violated § 1036(a)(1)(A) of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

**DEMAND FOR RELIEF**

~~199.~~202. Wherefore, the Bureau, pursuant to §§ 1054 and 1055 of the CFPA, 12 U.S.C. §§ 5564 and 5565, and the Court's own equitable

powers, requests that the Court:

a. permanently enjoin Defendants from committing future violations of the CFPA, the FDCPA, or any other provision of "Federal consumer financial law," as defined by 12 U.S.C. § 5481(14);

b. grant additional injunctive relief as the Court may deem to be just and proper;

c. award damages and other monetary relief against Defendants as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the CFPA and the FDCPA, including but not limited to rescission or reformation of contracts, restitution, and the refund of monies paid;

d. order disgorgement of Defendants' ill-gotten gains;

e. award civil money penalties;

f. award the costs of bringing this action; and

g. award additional relief as the Court may determine to be just and proper.

Dated: ~~January 10~~February 23, 2022 Respectfully submitted,

Eric Halperin
*Enforcement Director*
Richa S. Dasgupta
*Deputy Enforcement Director*

Formatted: Indent: Left: 2.5", First line: 0.5"

James T. Sugarman
*Assistant Litigation Deputy*

/s/ Lindsay Castanien
Lindsay Castanien
Vanessa Buchko
Stephanie Brenowitz
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone (Castanien): 202-435-9372
Telephone (Buchko): 202-435-9593
Telephone (Brenowitz): 202-435-9005
Fax: 202-435-7722
E-mail: Lindsay.Castanien@cfpb.gov
E-mail: Vanessa.Buchko@cfpb.gov
E-mail: Stephanie.Brenowitz@cfpb.gov
*Attorneys for Consumer Financial Protection Bureau*

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Consumer Financial Protection Bureau,<br><br>Plaintiff,<br><br>v.<br><br>Craig Manseth, Jacob Adamo, Darren Turco, United Debt Holding LLC, JTM Capital Management, LLC, UHG, LLC, UHG I LLC (also known as United Holding Group), and UHG II LLC (collectively holding themselves out as United Holding Group, United Holding Group, LLC, and United Holdings Group, LLC)<br><br>Defendants. | Case No. 1:22-CV-29-LJV<br><br>**CERTIFICATE OF SERVICE** |

**CERTIFICATE OF SERVICE**

The Bureau electronically filed an Amended Complaint and an Exhibit on February 23, 2022.

I hereby certify that, on February 23, 2022, I will send copies of the Amended Complaint and the Exhibit by electronic mail, and cause them to be sent by Overnight Delivery Service on February 24, 2022, to the following counsel for Craig Manseth, Jacob Adamo, Darren Turco, United Debt Holding LLC, and JTM Capital Management, LLC:

Sarah J. Auchterlonie
Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street, Suite 2200
Denver, Colorado 80202

sja@bhfs.com

/s/ Lindsay Castanien
Lindsay Castanien
*Enforcement Attorney*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: 202-435-9372
E-mail: Lindsay.Castanien@cfpb.gov
*Attorney for Consumer Financial Protection Bureau*